**Karen SORLUCCO, Plaintiff–Appellant,**

**v.**

**NEW YORK CITY POLICE DEPARTMENT, Defendant– Appellee.**

**No. 1518, Docket 92–7165.**

United States Court of Appeals, Second Circuit.

Argued June 3, 1992.

Decided July 28, 1992.

Peter A. Sullivan, Brooklyn, N.Y. (Kathleen A. Sullivan, Jennifer L. Zuch, BLS Legal Services Corp., of counsel), for plaintiff-appellant.

John Hogrogian, New York City (O. Peter Sherwood, Leonard Koerner, Robert Trachtenberg, Steven J. Rappaport, New York City Corp. Counsel, of counsel), for defendant-appellee.

Richard T. Seymour, Michael Selmi, Sharon R. Vinick, Washington, D.C., filed a brief amicus curiae on behalf of Lawyers' Committee for Civil Rights Under Law.

Before: OAKES, Chief Judge,* LUMBARD and WALKER, Circuit Judges.

WALKER, Circuit Judge:

This case comes to us on appeal from the final judgment of the United States District Court for the Southern District of New York, Hon. Michael B. Mukasey, *Judge.* Following a jury trial that culminated in a verdict for plaintiff-appellant, Karen Sorlucco ("Sorlucco"), on her 42 U.S.C. § 1983 claim, the district court: (1) granted defendant-appellee, New York City Police Department's ("NYPD"), motion for judgment n.o.v.; (2) dismissed Sorlucco's claims against the NYPD for gender discrimination in violation of Title VII; and (3) in the alternative, granted the NYPD's motion for a new trial. For the following reasons, we reverse the district court's judgment, and remand the case with instructions to reinstate the jury's verdict on her § 1983 claim and enter judgment in favor of Sorlucco on her Title VII claim.

## BACKGROUND

It was undisputed at trial that in January of 1983, while Sorlucco was a probationary police officer (one that had been on the force for less than 18 months) in good standing with the NYPD, she was sexually assaulted. At trial, she testified to the following. In the early morning of January 13, 1983, after finishing her shift of duty at the 94th precinct in Brooklyn, Sorlucco invited tenured NYPD officer, John Mielko ("Mielko"), to her apartment in Nassau County, New York. For some time, the two sat in Sorlucco's kitchen simply talking. While she was preparing a pot of coffee, Mielko got up from the table and

---

* After argument but before decision, Chief Judge Oakes became a Senior Circuit Judge.

left the room. He entered her bedroom where he found her service revolver. Mielko then returned to the kitchen, where, pistol in hand, he ordered Sorlucco back into the bedroom. Once there, he aimed the gun at her head and proceeded to sexually abuse her.

Sorlucco testified that this assault lasted approximately six hours, during which time Mielko brutally sodomized her. She claimed that he continuously threatened to kill her if she did not comply with his demands and that, at one point, Mielko fired a bullet from her gun into the bed. Mielko left the apartment shortly before 6:00 a.m., taking Sorlucco's service revolver with him. Sorlucco later found the gun on the front seat of her car.

Sorlucco testified that, following the attack, she was in shock and afraid for her life, and therefore, did not immediately tell anyone of the attack. The next day, January 14, Sorlucco went to the 94th Precinct to pick up her paycheck. According to Sorlucco, while she was at the station, Mielko cornered her on a stairway; when she told Mielko that she was going to report him, he threatened to kill her if she did.

On January 17, Sorlucco sought medical treatment from her gynecologist. For the first time, she confided in someone that she had been attacked, but she refused to name the man who did it. Sorlucco's doctor erroneously told her that the law required him to report the assault, and that if she did not do it herself, he would be forced to do so against her wishes.

Later that night, Sorlucco confided in her friends, Ralph and Natalie Schwartz. She told them about the attack, but did not name Mielko. The Schwartzes convinced Sorlucco to file a report with the Nassau County Police Department, and Ralph accompanied her to the local police station. At the station, Sorlucco asked to speak with a female officer but was refused. During the interview with the male officer who was assigned to take her statement, the officer made vulgar and abusive remarks to Sorlucco. Feeling twice victimized, Sorlucco left the police station without completing her statement.

Later that evening, officers from the Nassau County Police Department, along with Ralph Schwartz, went to Sorlucco's apartment and told her that she had to return to the station to complete her statement. Sorlucco complied, but did not implicate Mielko. Instead, as she testified at trial, she fabricated an account of what had happened. Sorlucco stated that the assault had occurred on January 7, not the 13th, and was perpetrated by a man named "John" whom she had met at a laundromat. The next day, January 18, Sorlucco repeated substantially the same story again to the Nassau County Police.

On the night of January 17, while Sorlucco was giving her statement, the Nassau County Police contacted the NYPD. The NYPD immediately dispatched Captain John Hunt ("Hunt") to the Nassau County precinct. Upon his arrival, he received and read a copy of Sorlucco's complaint. Thereafter, Hunt went to Sorlucco's apartment to speak with her. Since it was late, he did not press her for an account of what had happened. Instead, Hunt placed her on modified assignment—a non-patrol duty status which involves the removal of an officer's badge and gun.

According to the police regulations, an officer may be placed on modified assignment for various criminal infractions, violations of departmental regulations, and whenever the circumstances indicate that such action would be in the best interests of the department. Placing someone on modified assignment is left to the discretion of the ranking officer in-charge. There was trial testimony to the effect that "modified assignment" is commonly understood by rank and file police officers to be a stigmatizing disciplinary status.

Hunt also ordered Sorlucco to report to the department's Psychological Services Division ("Psychological Services") the next morning. He referred her case to the NYPD's Field Internal Affairs Division ("Internal Affairs") for further investigation, and forwarded a memorandum to the Police Commissioner entitled "Allegations of Serious Misconduct." This document reflected Sorlucco's claim of sexual assault

by an unknown man, but nevertheless suggested that "charges and specifications" be drawn up against Sorlucco. In view of the fact that Hunt was unaware of any claim against Mielko, and thus was under the impression that Sorlucco had been lax about safeguarding her weapon in the presence of an unknown civilian, the harshness of his recommendation is somewhat tempered. However, its facial insensitivity to Sorlucco accurately foreshadowed the NYPD's internal investigation, or more appropriately—lack of investigation—which followed.

On January 21, Sorlucco returned to the Nassau County Police Department and named Mielko as her attacker. The Nassau County police notified NYPD's Lieutenant Carmine LaCava ("LaCava") of Internal Affairs that Sorlucco had accused a fellow NYPD officer of sexually abusing her. LaCava immediately went to Nassau County to confer with the police. While he was there, however, LaCava made no effort to find Sorlucco and obtain her version of what had happened. Nor, at that time, did LaCava take any preliminary action, such as ordering modified assignment for Mielko—an armed police officer who had been accused by another officer of aggravated sexual assault.

On January 26, Mielko passed a lie detector test conducted by the Nassau County Police. On February 1, Sorlucco also underwent a polygraph test administered by the Nassau County Police. According to Sorlucco, after the examiner asked her a few questions that were unrelated to the attack, he "jump[ed] up and scream[ed]" that she was "a liar, that [she] failed, [she] didn't deserve to be a cop." This outburst caused Sorlucco to become emotionally distraught and the examination ended abruptly. Sorlucco recounted that after she was accosted in this manner by the Nassau County polygraph examiner, a local police lieutenant took her from the room and told her that "if [she] did not sign a piece of paper, that [she'd] lose her job." Sorlucco signed.

Unlike the report of Mielko's successful lie detector test of January 26, which was forwarded to the NYPD, Nassau County never produced any documentation of the events surrounding Sorlucco's test. The following day, February 2, Sorlucco took a privately administered polygraph test which canvassed the circumstances of her attack and indicated that she was telling the truth.

At trial, Sorlucco testified that the paper she signed at the Nassau County Police station on February 1 was blank and furthermore, that she did not then understand that it was intended to withdraw charges against Mielko. As we shall discuss in greater depth, there was conflicting evidence at trial as to whether when Sorlucco signed the paper, she knew that she had withdrawn her complaint against Mielko.

Following the February 1 polygraph episode, Nassau County brought criminal charges against Sorlucco for having falsely stated that she did not know the man who had raped her. On May 23, she appeared at the Nassau County courthouse for arraignment on her false statement charges. Following Sorlucco's arraignment, LaCava of Internal Affairs, who was present, immediately suspended her from the NYPD without pay. The justification given for the suspension was Sorlucco's Nassau County arrest on the false statement charges. The NYPD then instituted departmental charges against Sorlucco that restated the Nassau County criminal complaint and also accused Sorlucco of failing to safeguard her service revolver and failing to report that her gun had been fired. By this time, aware of Sorlucco's claim that Mielko was the attacker, the NYPD was on notice that Sorlucco had allegedly permitted her weapon to fall into the hands not of a stranger, but of a fellow officer.

Before suspending and lodging departmental charges against her, neither LaCava, nor anyone else from the NYPD, actually spoke with Sorlucco. She had no opportunity to explain her false statements or her failure to safeguard her weapon. As of May 23, the NYPD had still not questioned Mielko.

On June 3, more than four months after she first reported the attack and named

Mielko, Sorlucco was interviewed by LaCava for the first and only time. At trial, LaCava explained the delay by claiming that he did not want to interfere with Nassau County's investigation. However, no such request emanated from Nassau County; evidence at trial established that Nassau County had given LaCava permission to contact witnesses as early as February 17. LaCava also testified that his investigation was hindered because he did not receive the Nassau County police file on the case until May 18. Yet, LaCava also testified to the effect that the delay was immaterial since the file did not contain anything which he did not already know. At no time did LaCava review the crime scene or any physical evidence. He interviewed no witnesses from January until June.

In May, Sergeant Paul Massucci ("Massucci") of the NYPD Employment Management Division ("Employment Management") learned that Sorlucco had been criminally charged in Nassau County, and received a copy of the NYPD's departmental charges. Massucci drafted a memorandum, dated June 21, 1983, recommending that Sorlucco be terminated. Before making this recommendation, Massucci conferred with his immediate superior within Employment Management. However, he did not consult with either Internal Affairs or Psychological Services, both of which he knew to be involved in Sorlucco's case. Massucci knew that Sorlucco claimed to have been sexually assaulted, but he testified that he was unaware that Sorlucco had accused Mielko of being her attacker.

Massucci testified that he simply assumed Sorlucco had lied about being sexually attacked. However, Sorlucco's claim that she was sexually attacked and brutally assaulted was never in question; the false statement charges levelled against Sorlucco by Nassau County related only to her original claim that, from January 17 to January 21, she did not know the man who had attacked her.

Had Massucci conferred with Psychological Services before recommending termination, he would have uncovered corroborating evidence to support Sorlucco's allegations. Dr. Eloise Archibald, an NYPD psychologist who had treated Sorlucco from January to May, 1983, diagnosed Sorlucco as experiencing symptoms of Rape Trauma Syndrome. Indeed due to the devastating effects of the attack, as early as February 14, Dr. Archibald placed Sorlucco on "restricted duty."

Dr. Archibald explained that restricted duty is a health related status that relieves a police officer of his or her regular police work—including, where necessary, carrying a firearm. She further explained that when a department health professional is unavailable to assess the condition of an officer who is suspected of having a serious psychological problem, and therefore emotionally unfit to carry a weapon, a field supervisor will place that officer on modified assignment. Modified assignment status serves as an interim precaution pending the officer's evaluation by Psychological Services. Hunt followed this procedure on January 17 (the date Sorlucco first reported the attack) when he placed Sorlucco on modified assignment. After Dr. Archibald placed Sorlucco on restricted duty, she was kept on modified assignment—an act that Sorlucco claimed at trial was discriminatory. Dr. Archibald noted that modified assignment is "usually [used] in connection with some sort of disciplinary case or pending investigation."

On July 15, 1983 the New York City Police Commissioner, acting on Massucci's memorandum recommendation which had already been endorsed by the NYPD's Chief of Personnel, Deputy Commissioner for Management & Budget, and First Deputy Commissioner, terminated Sorlucco's employment with the NYPD. On August 25, 1986, Sorlucco was convicted in court on four misdemeanor counts for making false statements to the Nassau County Police. On October 21, 1987, the Appellate Division reversed the four convictions and dismissed the charges.

The Commissioner received a letter dated August 25, 1983 from the New York City Advisory Task Force on Rape that complained of the NYPD's unduly harsh treat-

ment of Sorlucco and the department's failure to investigate Mielko. Thereafter, whether by coincidence or otherwise, LaCava sought for the first time to interview the man Sorlucco had accused. So as not to upset Mielko's summer vacation plans, LaCava arranged for them to meet on September 16—approximately eight months after Sorlucco first named Mielko as her attacker. This interview, which lasted fifteen minutes, was the only time that LaCava spoke with Mielko. Mielko admitted going to Sorlucco's apartment on January 14 and having consensual sexual relations with her. He denied any wrongdoing.

Beyond denying that he raped or sodomized Sorlucco, Mielko's version was inconsistent with Sorlucco's in one other way. Mielko stated that, in response to an invitation from Sorlucco through the precinct switchboard, he visited Sorlucco the night after the alleged attack. Sorlucco denied that this second visit ever took place, and the department's tape recording of switchboard activity on that date reflects that no such call was ever received. LaCava did not pursue any investigation into the questionable aspects of Mielko's statement.

During the course of the NYPD's investigation into Sorlucco's allegations to the effect that a fellow officer, Mielko, was her rapist, Mielko was never placed on modified assignment, restricted duty, suspended or otherwise disciplined. This incident does not appear in his personnel file. On December 29, approximately one year after the attack, LaCava concluded that there were no grounds for disciplinary action against Mielko.

In short, the outcome of the NYPD's investigation was that Sorlucco was suspended and ultimately fired for initially alleging and maintaining (for four days before she actually identified Mielko) that her attacker was simply named "John," while Mielko, the accused rapist, subsequently retired from the NYPD with his regular police pension.

## PROCEEDINGS TO DATE

On August 30, 1985, Sorlucco brought this action in the district court alleging that the NYPD maintained her on modified assignment and then terminated her on the basis of gender in violation of 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* She further alleged that the NYPD conspired with the Nassau County Police to deprive her of equal protection of the laws in violation of 42 U.S.C. § 1985. On defendant's motion for summary judgment, the district court ruled that even though Sorlucco had pled a *prima facie* case of gender discrimination, she did not adduce sufficient evidence to support it. Thus, the district court granted summary judgment on all claims in favor of the defendant. *See generally Sorlucco v. New York City Police Dept.,* 703 F.Supp. 1092 (S.D.N.Y. 1989).

With regard to the § 1983 and Title VII claims, we reversed stating that "[i]t is for a jury to determine whether Sorlucco's charges against Mielko are true and, if so, whether the discipline meted out to her was unlawfully disparate to that received by her male fellow officer." *Sorlucco v. New York City Police Dept.,* 888 F.2d 4, 8 (2d Cir.1989). We affirmed the district court's dismissal of the § 1985 claim. *Id.*

Sorlucco's § 1983 and Title VII claims were tried to a jury and to the bench, respectively. The jury returned a verdict in favor of Sorlucco. It found the NYPD liable under § 1983 for continuing Sorlucco on modified assignment for the period of time prior to her suspension (January 17 to May 23), and for ultimately terminating her—both actions being discriminatory on the basis of sex. The jury concluded that Sorlucco suffered no damages as a result of being continued on modified assignment, but awarded her $264,242 for wrongful termination.

The NYPD moved for judgment n.o.v., and, in the alternative, a new trial. In addition to opposing the motion, Sorlucco argued to the district court that the provisions of the Civil Rights Act of 1991, Pub.L. No. 102–166, which had become effective in the intervening period after the trial, and had amended Title VII to allow for jury trials and compensatory damage

awards in employment discrimination suits, should be applied retroactively to her Title VII claim.

On January 7, 1992, 780 F.Supp. 202, the district court granted the NYPD's motion for judgment n.o.v., and set aside the jury's verdict on the § 1983 claim. Alternatively, the district court granted the defendant's motion for a new trial. In so doing, the district judge concluded that there was no evidence presented at trial to link the Commissioner to any alleged discrimination in association with Sorlucco's termination and that no reasonable jury could infer an unconstitutional pattern or practice of gender discrimination from the evidence of disparate disciplinary treatment between male and female probationary officers who had been arrested. With respect to Sorlucco's non-jury Title VII claim, the district court rejected her Civil Rights Act retroactivity argument, and found the absence of any discrimination against Sorlucco by the NYPD. Finally, the district judge found part of Sorlucco's testimony perjurious, and thus determined, in any event, that a new trial was warranted. This appeal followed.

## DISCUSSION

On appeal, Sorlucco challenges the district court's findings of insufficient evidence regarding her § 1983 claim and argues that, because her § 1983 verdict should stand, the jury's finding of sex discrimination collaterally estopped the district court from finding against her on the Title VII claim. Because we agree with these arguments, we reverse the district court and order judgment be entered in favor of Sorlucco. Moreover, we conclude that the challenged testimony by Sorlucco, while questionable, does not merit a new trial.

### A. Section 1983 Liability

Relying upon *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), Sorlucco argues a jury could properly find that the evidence "fairly represent[ed]" an informal NYPD practice in violation of § 1983. *Id.*

at 694, 98 S.Ct. at 2037. In addition, she claims that the evidence was sufficient for the jury to conclude that the Commissioner's decision to terminate her was based upon gender discrimination. She further argues that, with respect to the hiring and firing of probationary police officers, the Commissioner is the final policy-making authority for New York City, and thus, his single discriminatory act is sufficient to generate § 1983 liability. *See Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989); *St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) (plurality); *Pembaur v. Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986). Because we conclude that Sorlucco adduced sufficient evidence from which the jury could reasonably infer an unconstitutional NYPD practice of sex discrimination, we need not reach Sorlucco's argument regarding the Commissioner's actions.

■ A municipal agency may not be held liable under § 1983 simply for the isolated unconstitutional acts of its employees. *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037 (rejecting *respondeat superior* as a basis of § 1983 liability). In order to impose § 1983 liability upon a municipality, a plaintiff must demonstrate that any constitutional harm suffered was the result of a municipal policy or custom. *Id.* at 690–91, 98 S.Ct. at 2035–36; *see also Pembaur*, 475 U.S. at 478–79, 106 S.Ct. at 1297–98; *Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119, 122 (2d Cir.1991); *Fiacco v. City of Rensselaer*, 783 F.2d 319, 326 (2d Cir.1986).

■ The policy or custom used to anchor liability need not be contained in an explicitly adopted rule or regulation. *See Ricciuti*, 941 F.2d at 123. Constitutional deprivations actionable under § 1983 may be "visited pursuant to governmental 'custom' even though such custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036. So long as the discriminatory practices of city officials are persistent and widespread, they "could be so permanent and well settled as

to constitute a 'custom or usage' with the force of law," and thereby generate municipal liability. *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 168, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970)); *see also* 1 M. Schwartz & J. Kirklin, *Section 1983 Litigation*, § 7.8, at 364 (2d ed. 1991) ("A persistent practice may constitute municipal policy whether it is carried out by the policymakers themselves, by other high-ranking officials, or even by subordinate employees."). However, before the actions of subordinate city employees can give rise to § 1983 liability, their discriminatory practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials. *See Praprotnik*, 485 U.S. at 130, 108 S.Ct. at 927; *Krulik v. Board of Educ. of the City of New York*, 781 F.2d 15, 23 (2d Cir.1986).

The theory of Sorlucco's case is that the NYPD engaged in a pattern of disciplining probationary officers, who had been arrested while on probation, in a discriminatory and disparate manner based upon their gender. Sorlucco argues that this institutional bias was evident by the demonstrably reflexive assumption of the male superior officers handling her case that she was lying and Mielko was not. This discrimination culminated, the argument continues, in the ensuing disciplinary penalties that Sorlucco suffered as a result of their prejudice.

■■■■ The district court, however, concluded that the evidence in this case was insufficient to establish an unconstitutional pattern or practice of sex discrimination within the NYPD, and thus set aside the jury's verdict. As we have stated in the past, judgment n.o.v. is reserved for those rare occasions when there is

"such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result o[f] sheer surmise and conjecture" or the evidence must be so overwhelming that reasonable and fair minded persons could only have reached the opposite result.

*Stubbs v. Dudley*, 849 F.2d 83, 85 (2d Cir. 1988) (quoting *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 688–89 (2d Cir.1983)).

Upon review of the evidence that was presented here, we disagree with the district court that the record is devoid of evidence supporting the verdict and that the jury's verdict was therefore an irrational one.

At trial, Sorlucco introduced into evidence the results of the NYPD's own study, regarding the suspension and termination of probationary officers. The study documented that between 1980 and 1985, a total of forty-seven probationary officers were arrested. Of those, twelve resigned leaving thirty-five subject to departmental discipline. Thirty-one of the remaining officers were men; nine were reinstated, and twenty-two were fired. All four of the women probationers who had been arrested, however, were terminated.

The district court ruled that it was not possible "that the jury could have concluded rationally that Sorlucco's dismissal was part of a pattern or practice of discrimination.... Comparing four dismissals of women to nine dismissals of men, over a period of five years, could not show the Police Commissioner was engaged in a pattern or practice of discrimination." Apart from the fact that the nine male officers, to which the district court refers, were reinstated and not dismissed, we believe that the district court erred in other ways.

First, while the district court's statement is not completely clear on this point, its language suggests that the court required Sorlucco to demonstrate that the Commissioner, himself, was actively engaged in a pattern and practice of discrimination. To the extent that the district court employed such a standard, we reject it. While discrimination by the Commissioner might be sufficient, it was not necessary. As stated previously, a § 1983 plaintiff may establish a municipality's liability by demonstrating that the actions of subordinate officers are sufficiently widespread to constitute the constructive acquiescence of senior policymakers. *See Praprotnik*, 485 U.S. at 130, 108 S.Ct. at 927; *Krulik*, 781 F.2d at 23. Thus, Sorlucco did not have to prove that the Commissioner actively participated in

the general discriminatory practice of his department.

Second, we believe that the district court erred in dismissing the results of the NYPD study as "statistically insignificant." Simply because the actual number of female probationers that were fired was small, does not necessarily mean that those statistics lacked any probative force. One must consider those numbers in relation to the ratio of females to males in the pool of officers under consideration. Over 10% of the thirty-five probationary officers disciplined were women. One hundred percent of that group was terminated by the department. In contrast, approximately 63% of the men who were disciplined were ultimately fired.

The district court further discounted the import of this statistical evidence by concluding that, "[g]enerally, the cases of the nine men who were restored to duty after having been arrested during their probationary period involved less serious charges, or circumstances more strongly suggesting actual innocence, than the cases of the four women who were fired." The evidence showed that the nine men who were reinstated were involved in incidents of claimed shoplifting and conspiracy to shoplift; menacing and assault; menacing with a firearm and racial harassment; driving while impaired; and leaving the scene of an accident. The incidents involving the four women who were fired included shoplifting and supermarket fraud; assault; driving while intoxicated; and, in Sorlucco's case, making a false statement on a rape complaint. We need not second-guess the district court's evaluation of the relative severity of the crimes enumerated for the same reason that we believe the district court should not have substituted its judgment for that of the jury on this point. This type of analysis went to the weight of the statistical evidence presented, not its relevancy, and therefore, whatever we or the district court might think of it, it was for the jury to evaluate.

We might agree with the district court that Sorlucco would have fallen short in her proof if the NYPD study had been her only evidence of a departmental practice of gender discrimination. *Cf. Haskell v. Kaman Corp.*, 743 F.2d 113, 121 (2d Cir.1984) (Title VII case). However, Sorlucco presented ample facts concerning her treatment at the hands of her superiors from which the jury, in conjunction with the statistical evidence, could have reasonably inferred that there was a custom of sex bias operating within the NYPD and governing its disciplinary decisions, at least as to probationary officers. *Cf. Ingram v. Madison Square Garden Center, Inc.*, 709 F.2d 807, 810-11 (2d Cir.1983) (small statistical sample, taken in conjunction with other evidence indicative of bias, was sufficient to support an inference of discriminatory practice); *Watson v. Kansas City*, 857 F.2d 690, 696 (10th Cir.1988) (*inter alia*, evidence showing that in plaintiff's particular case police conduct over a period of time would support a finding of discriminatory police practice). "[T]his was not a case in which [Sorlucco] relied on 'statistics alone.'" *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977). We believe that Sorlucco's evidence concerning her "personal experiences with the [NYPD] brought the cold numbers convincingly to light," *id.*, at least to the extent where the jury could rationally reach the result it did.

The jury heard testimony from John McKay ("McKay"), formerly a NYPD Lieutenant with Internal Affairs for thirteen years, to the effect that the department's investigation of Mielko was dilatory and negligent. He testified that, due to the reprisals commonly associated with "breaking ranks," police officers are usually hesitant to report fellow officers for any misconduct. McKay stated that, as a result of the expected retaliation, it was his experience that most complaints lodged by one officer against another were true. Thus, LaCava's failure to take Sorlucco's claim seriously seemed inexplicable to McKay.

In addition, the jury had before it evidence from which it could infer that bias existed throughout the department. The actions of two internal offices of the NYPD (Internal Affairs and Employment Manage-

ment), working independently of each other, could have been reasonably taken to indicate that, as between Sorlucco and Mielko, department officials reflexively assumed the former was lying because she was a woman. LaCava and his Internal Affairs superiors conducted their non-investigation into Sorlucco's charges, and prior to suspending Sorlucco, maintained her on modified assignment even though Psychological Services had placed her on restricted duty—a much less stigmatizing status. Massucci and his Employment Management superiors recommended to the Commissioner that Sorlucco be fired without reviewing reports from Internal Affairs and Psychological Services even though the record suggests that they knew such reports existed. Indeed, Massucci candidly testified that he handled the matter in this way because he assumed Sorlucco was lying.

While Sorlucco did not press her claim upon a theory of the NYPD's failure to train or supervise its internal affairs officers, see *City of Canton v. Harris*, 489 U.S. 378, 388–92, 109 S.Ct. 1197, 1204–06, 103 L.Ed.2d 412 (1989) (inference of unconstitutional policy may be drawn from evidence that municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction), we note in passing a possibility that such a theory would prevail under the circumstances presented here. In our view, given the undisputed fact of Sorlucco's brutal sexual assault, the NYPD tragically failed to show any sensitivity to the physical trauma and the resulting psychological manifestations commonly experienced by rape victims. It is not too much to expect that public agents charged with the investigation of devastating sexual crimes appreciate the nature of the casualties inflicted.

In the context of a failure to supervise case, we have stated that, "a single, usually brutal or egregious beating administered by a group of municipal employees may be sufficiently out of the ordinary to warrant an inference that it was attributable to inadequate training or supervision." *Turpin v. Mailet*, 619 F.2d 196, 202 (2d Cir.),

*cert. denied*, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980) (citing *Owens v. Haas*, 601 F.2d 1242 (2d Cir.1979)). By analogy, the relatively harsh disciplinary treatment Sorlucco received from the NYPD when compared with the total absence of any meaningful investigation into Mielko's conduct, seems to us sufficiently egregious to warrant an inference that could, when coupled with the statistical proof, justify a jury's finding of an unconstitutional departmental practice of sex discrimination.

In conclusion, we believe that the NYPD's handling of the Sorlucco case, supplemented by the results of the NYPD study, permitted the jury to reach the verdict it did on Sorlucco's § 1983 claim. We therefore reverse the district court's entry of judgment n.o.v.

B. *Title VII Liability*

With regard to her Title VII claim, Sorlucco argues that: (1) the district court was collaterally estopped from finding no Title VII liability by the jury's specific finding, in connection with the § 1983 claim, that the NYPD discriminated against her; and (2) the district court should have applied §§ 102(a) and 102(c) of the Civil Rights Act of 1991 retroactively thereby entitling her to a jury trial on Title VII liability and compensatory damages. *See Bradley v. School Bd. of City of Richmond*, 416 U.S. 696, 717, 94 S.Ct. 2006, 2019, 40 L.Ed.2d 476 (1974) ("a court is to apply the law in effect at the time it renders its decision"). Since we agree with Sorlucco's collateral estoppel argument, we do not address her Civil Rights Act retroactivity claim.

■ Having determined that the jury's verdict on Sorlucco's § 1983 claim was valid, it follows in this case that the district court was collaterally estopped from finding that the NYPD had not violated Title VII. *See Wade v. Orange County Sheriff's Office*, 844 F.2d 951, 954 (2d Cir.1988). In *Wade*, plaintiff's claim under 42 U.S.C. § 1981 was tried to a jury, while his Title VII claim was simultaneously tried to the bench. The jury found racial discrimina-

tion; the court found none. We held that "when a jury has decided a factual issue, its determination has the effect of precluding the court from deciding the same fact issue a different way." *Id.* The fact that *Wade* involved a § 1981 claim and this concerns a § 1983 claim is irrelevant; the underlying principle applies equally in both cases.

In dismissing Sorlucco's Title VII claim, the district court ruled that the jury's finding regarding discrimination did not raise any collateral estoppel concerns. The district judge distinguished the factual issue that was decided by the jury from the one before him by concluding that "[t]he jury in this case ... was asked at most to decide whether the *Police Commissioner* had discriminated." (emphasis added). Since the district court concluded that judgment n.o.v. on Sorlucco's § 1983 claim was warranted because, *inter alia,* Sorlucco failed to directly implicate the Commissioner in any discriminatory conduct, the court reasoned that it was free to act as a *de novo* Title VII fact finder on the question of departmental bias.

The record does not support the factual distinction drawn by the district court. As the special verdict questions submitted to the jury make evident, the jury separately found that (1) the NYPD discriminated against Sorlucco by virtue of continuing her on modified assignment and by ultimately firing her, and (2) that these discriminatory actions constituted a policy or practice of the NYPD. Although these two elements are both necessary to a valid § 1983 claim, they remain distinct.

Over six pages of the district court's jury charge were devoted to explaining the appropriate law regarding proof of unlawful gender discrimination and the requisite causal nexus between a defendant's discriminatory conduct and a plaintiff's injuries. In that portion of the charge, the district judge consistently referred to the subject behavior for the jury to consider as that of the NYPD, not the Commissioner. The jury's affirmative finding with respect to the first leg of Sorlucco's § 1983 claim, i.e., that she was the victim of particular

discriminatory acts of the *NYPD,* was therefore sufficient to establish her Title VII injury. *Cf. Knight v. Nassau County Civil Serv. Comm.,* 649 F.2d 157, 161–62 (2d Cir.), *cert. denied,* 454 U.S. 818, 102 S.Ct. 97, 70 L.Ed.2d 87 (1981) (in failing to prove disparate treatment for Title VII purposes, plaintiff "necessarily failed to meet the purposeful discrimination requirement for a section 1983 violation").

Thus, we think that the district court erroneously concluded that the jury relied solely on a theory of "Commissioner discrimination" in reaching its § 1983 verdict. The jury considered the Commissioner's actions only with respect to the policy or practice element of Sorlucco's § 1983 claim, and then only as an alternative basis. The court charged the jury: "you may still find that [a single act] represented an official policy or custom of the New York City Police Department, provided that a deliberate choice to follow a course of action was made from various alternatives by the New York City Police Commissioner." However, prior to that, the district court specifically charged the jury that "[a] policy or custom is a persistent, widespread course of conduct that has become a traditional way of carrying out policy and has acquired the force of law, even though that course of conduct may not have been formally adopted or announced."

It is therefore clear from the record that the jury was asked to consider discriminatory policy or custom generally, not simply "whether the Police Commissioner had discriminated." This being the case, the jury's § 1983 finding that "the defendant intentionally discriminated" against Sorlucco disposed of her Title VII claim. The district court was collaterally estopped from ruling to the contrary. *See Wade,* 844 F.2d at 954.

## C. *New Trial Motion*

Sorlucco also contends that the district court abused its discretion in ordering a new trial. The district court granted the NYPD's alternative motion for a new trial on the grounds that Sorlucco likely perjured herself at trial. The basis for the

district court's determination stems from the discrepancy, mentioned earlier, between Sorlucco's statement that she did not know at the time she signed an allegedly blank form at the Nassau County police station that she was withdrawing her charges against Mielko, and the notes of the Psychological Services psychologist, Dr. Archibald, which recount a contemporaneous telephone conversation with Sorlucco in which Sorlucco supposedly stated that she had just dropped all the charges.

The district court reasoned that since Dr. Archibald had no motivation not to tell the truth, then Sorlucco must be lying. The court further concluded that "[t]he question of whether Sorlucco knowingly signed a statement withdrawing her charges against Mielko goes directly to the question of whether the charges were true. Her sworn denial that she knowingly signed the statement raises the strong inference that she perjured herself on that critical issue." Believing that the jury's verdict was based upon this alleged perjury, the district court decided that a new trial was in order.

 The district court's grant of a new trial motion is usually warranted only if it "is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir.1988); *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir.1978). We review the denial of a such a motion for abuse of the trial court's discretion. *See Smith*, 861 F.2d at 370; *Bevevino*, 574 F.2d at 684. While some courts apply the same standard when reviewing a grant of a new trial motion, *see e.g., Portage II v. Bryant Petroleum Corp.*, 899 F.2d 1514, 1523 (6th Cir.1990); *Coffran v. Hitchcock Clinic, Inc.*, 683 F.2d 5, 6 (1st Cir.), *cert. denied*, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982), others, in this context, employ more rigorous appellate scrutiny. *See e.g., Williams v. City of Valdosta*, 689 F.2d 964, 974 (11th Cir.1982); *Massey v. Gulf Oil Corp.*, 508 F.2d 92, 94–95 (5th Cir.), *cert. denied* 423 U.S. 838, 96 S.Ct. 67, 46 L.Ed.2d 57 (1975). We need not decide now which standard to adopt, however, because we conclude that, under either standard in this case, it was error for the district court to order a new trial based upon Sorlucco's allegedly perjurious testimony.

The veracity of Sorlucco's statement concerning her signing of the blank form, and her knowledge (or lack thereof) of its effect on withdrawing the criminal charges against Mielko was a matter of credibility for the jury to resolve. Indeed, the district judge explicitly recognized as much at trial when he stated that this "is a straight credibility issue for the jury." In later granting the new trial motion, the judge gave no reason for his change of mind.

This is not a case where contradictory evidence subsequently comes to light revealing a perjury that would warrant a new trial. All of the conflicting versions, if they were conflicting, were before the jury. The jurors heard both the testimony of Sorlucco on the point and that of Dr. Archibald, which tended to contradict it. They were free to settle upon which witness they believed. Under the circumstances, we think that the trial court overstepped its bounds and usurped the jury's function of judging credibility. *See Tennant v. Peoria & Pekin Union Railway Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944); *Wade*, 844 F.2d at 955; *cf. Williams*, 689 F.2d at 976 (abuse of discretion to grant new trial where " 'there is no great weight of the evidence in either direction' "). Thus, we find that the district court abused its discretion in granting a new trial.

CONCLUSION

For the foregoing reasons, we conclude that the district court erred in granting the NYPD judgment n.o.v. on Sorlucco's § 1983 claim and in dismissing her Title VII claim. Furthermore, we conclude that the district court abused its discretion in granting the NYPD a new trial. Accordingly, we reverse the judgment of the district court and remand with instructions to reinstate the jury's verdict on the § 1983 claim and to enter judgment in Sorlucco's favor on her Title VII claim.

Reversed and remanded.