10-2565-cv (L)
Raedle v. Credit Agricole Indosuez

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2011

(Argued: November 10, 2011                    Decided: February 28, 2012)

Docket Nos. 10-2565-cv (Lead) 10-2734-cv (XAP)

_____

WILLIAM F. RAEDLE,

*Plaintiff-Appellant-Cross-Appellee*,

v.

CREDIT AGRICOLE INDOSUEZ, LEE SHAIMAN,

*Defendants-Appellees-Cross-Appellants*,

DANIEL H. SMITH,

*Defendant*.

Before: POOLER, B.D. PARKER, LOHIER, *Circuit Judges*.

_____

Cross-appeal from an order of the United States District Court for the Southern District of New York (Griesa, *J.*), granting William F. Raedle a new trial, under Rule 59(a)(1)(A) of the Federal Rules of Civil Procedure, following a defense verdict on a claim against his former employer for tortious interference with a job offer from another firm. The second trial resulted in a verdict in Raedle's favor. We hold that the district court abused its discretion in granting the new trial.

REVERSED and REMANDED.

_____

ETHAN ANDREW BRECHER, Liddle & Robinson, LLP, New York, NY, *for Plaintiff-Appellant-Cross-Appellee*.

DAVID A. BERGER, Allegaert Berger & Vogel LLP, New York, NY (MICHAEL S. VOGEL, CORNELIUS P. MCCARTHY, KEVIN L. MACMILLAN, Allegaert Berger & Vogel LLP, New York, NY *on the briefs*), *for Defendants-Appellees-Cross-Appellants*.

_____

BARRINGTON D. PARKER, *Circuit Judge*:

This cross-appeal arises out of the trial and retrial of plaintiff William F. Raedle's claim against his former employer, Credit Agricole Indosuez ("CAI"), and Lee Shaiman, his supervisor at that firm, for tortious interference with a job offer from another firm. Following the first trial, the United States District Court for the Southern District of New York (Griesa, *J.*) vacated a defense verdict and granted Raedle a new trial. *See* Fed. R. Civ. P. Rule 59(a)(1)(A). Upon retrial, a second jury returned a verdict in Raedle's favor and awarded substantial monetary damages. We hold that the district court abused its discretion in granting the new trial. Accordingly, we reverse the order of the district court granting the new trial; vacate the judgment entered on the basis of the second verdict; and remand the case to the district court with instructions to reinstate the first verdict and to enter judgment in defendants' favor in accordance with that verdict.

## BACKGROUND

In 2004, Raedle, a financial analyst, sued his former employer CAI, a corporate and investment bank, and two former supervisors at CAI, Lee Shaiman and Daniel Smith. CAI fired Raedle in 2001 for allegedly poor performance. Shortly afterward he secured a job offer from

2

the Dreyfus Corporation ("Dreyfus"). But following conversations between CAI and Dreyfus – the contents of and parties to which are hotly disputed – Dreyfus rescinded the offer. Raedle sued for tortious interference with prospective contractual advantage, claiming that CAI, Shaiman, and Smith made false and disparaging comments about him to Dreyfus, resulting in the rescission of the offer. Following discovery, the district court granted summary judgment to Smith, but denied it as to CAI and Shaiman. The case proceeded to trial.

**The First Trial**

Since the main issue on appeal is whether the verdict in the first trial constituted a miscarriage of justice, we review in some detail the evidence presented. That evidence showed that in August 1998, Smith – then managing director of the U.S. merchant and investment banking unit of CAI – hired Raedle to work as a credit analyst in the firm's Asset Management area. Smith testified that Raedle's performance in 1999 was "satisfactory to above average." J.A. at 192. In January 2000, Smith hired Shaiman to serve as co-portfolio manager and head of research, at which point Shaiman became Raedle's supervisor. According to Smith, Raedle's performance deteriorated throughout 2000 until his relationship with Shaiman and Smith became "broken." J.A. at 198-199. They decided to fire him. As Smith explained at trial,

> I think philosophically we were trying to organize a business around a
> kind of teamwork structure where people supported one another,
> information was shared and we made decisions collectively. . . . I think
> [Raedle] felt like . . . he was more oriented into a star system where he
> didn't want to have responsibilities to the rest of the team to communicate
> his thoughts and his analysis such that we could make these collective
> decisions. I think as a result of that, he didn't agree with the way we were
> running the business. I felt like he didn't have any confidence or respect
> for management, myself, Lee Shaiman and his colleagues.

3

J.A. at 199. Shaiman testified that Raedle was "difficult, argumentative, didn't listen to direction, didn't take direction well, didn't produce the work product that we had asked him to, didn't train people we gave him opportunities to do things [*sic*] and fretted those opportunities away." J.A. at 162. A memorandum concerning Raedle's termination described his "principal short-comings" as "a) poor communication of his opinions regarding individual credits within his portfolio, b) inadequate documentation of his credit analysis, c) no clear leadership skills, d) inability to help develop junior analysts within the group." J.A. at 1066-1069.

After being fired in January 2001, Raedle promptly sought other employment and in March 2001 secured a job offer from Gerald Thunelius of Dreyfus to work as a high yield bond analyst. However, only weeks later, after contacting CAI and investigating Raedle's performance, Dreyfus rescinded the offer. According to notes Raedle said he took during a conversation with Thunelius in 2001, "[s]omething was said by Lee Shaiman that ended the offer." J.A. at 989. Raedle's notes from another conversation he said he had with Dreyfus's human resources manager, Mary Beth Leibig, also stated that Shaiman and Smith "[b]oth provided bad references. Both trashed me." J.A. at 992.

To prove that someone at CAI had tortiously interfered with his offer from Dreyfus, Raedle relied primarily on Thunelius's testimony about a telephone call allegedly placed by Leibig to someone at CAI as part of Dreyfus's due diligence regarding Raedle's prior employment. Thunelius testified that, following this call, he attended a meeting with Leibig, another human resources employee, and the chief investment officer of Dreyfus (the "Dreyfus meeting"), where he learned that "Will Raedle's boss" had offered Leibig "very non-discreet information about [Raedle]." J.A. at 243. In particular, he testified that "[Leibig] said that she

4

was fearful that there were some mental issues, that there were some ten[de]ncies of – I think the word used was psychopathic and there were other more terms like that thrown around." J.A. at 242-243. He said "[t]here was a lot of inference . . . to [Raedle] being, eventually being a problematic employee for mental-type issues" and that "[Leibig] said he had problems with some of his co-workers, male co-workers. . . . What I heard from her, there were a lot of very personal issues, that he might not be able to – he would not be a good employee for Dreyfus." J.A. at 243. When asked whether Leibig had actually used the word "psychopathic," Thunelius clarified that he did not recall whether she or someone else in the meeting had used the word. J.A. at 256.

Because he was "shocked" by what Leibig was saying, Thunelius testified, he later contacted CAI himself and spoke to "someone who identified himself as [Raedle]'s boss," whose name he could not recall, who "repeated" that Raedle "was a problem, that he had mental issues." J.A. at 243-244.

Sriram Balakrishnan, a former CAI employee, testified that Shaiman told him that he (Shaiman) had received a call concerning Raedle and "indicated that after what he [Shaiman] told him, he did not think that [Raedle] would get the job." J.A. at 36. Although Balakrishnan did not know what Shaiman had said or to whom, he testified that "[t]o the best of my recollection, I believe it was Dreyfus[] . . . . I have to caveat, it's just to the best of my recollection." J.A. at 36.

By contrast, Shaiman testified that he had no recollection of discussing Raedle with either Leibig or Thunelius, adding that "Thunelius" was an "unusual" name that he would have remembered – in part because his son had a poster of jazz musician Thelonious Monk in his

bedroom, which would have served as a "pneumonic." J.A. at 160. Shaiman explained that he would never have said Raedle had "mental issues" because "I would never say anything like that about anyone. This is a hot button issue for me personally. I have a 19-year old son that has behavioral and other special needs, and he has been in the care of a behavioral psychologist for a dozen or more years. . . . I would never do that based on my personal experience." J.A. at 311. Leibig similarly testified that she had no recollection of speaking to anyone at CAI.

Defense counsel argued to the jury that, even though none of the defense witnesses remembered discussing Raedle's employment prospects at Dreyfus, if Raedle's "boss" had given him a "bad reference" – as Thunelius supposedly reported to Raedle in 2001 – it would have been an honest one grounded in Raedle's poor performance at CAI. Indeed, Shaiman testified that, although he did not recall giving Dreyfus a reference about Raedle, he recalled an inquiry about Raedle from a professional acquaintance, Aldona Schwartz of Merrill Lynch. According to Shaiman, his response to Schwartz's questions about Raedle was, "I really don't want to talk about it, it wasn't a pleasant experience." J.A. at 164. He explained that "[w]hat I think I told – what I believe I told Ms. Schwartz was the truth. . . . I don't think there was any malice in my mind at all toward Mr. Raedle." J.A. at 165. Meanwhile, Thunelius testified that he had "[gone] to a few of the primary dealers, . . . asked if anybody knew of [Raedle] and what his reputation was," and heard "favorable things." J.A. at 240.

On cross-examination defense counsel aggressively attacked Thunelius's credibility. Counsel introduced Thunelius's deposition testimony in which he repeatedly testified that he could not recall the precise words spoken by Leibig in the Dreyfus meeting – only that the words seemed "of a personal nature." J.A. at 249. The core of Thunelius's trial testimony, on the other

hand, was that Leibig said that "Raedle's boss had told her that he had mental issues." J.A. at 255. When defendants attempted to impeach Thunelius on cross-examination using his deposition testimony, Thunelius insisted that he was testifying truthfully both in deposition and at trial because the word "personal" means "mental issues." J.A. at 261. Insinuating that the deposition questioners had simply failed to extract precise words from him, he explained that "[n]o one said to me, define strong personal issues." J.A. at 261. But during his deposition, he had professed apologetically, "I know it sounds hokey to everybody here, but I don't really remember" and "I hope everybody here realizes . . . that I wish that I could remember the exact wording." J.A. at 250-251.

The trial lasted five days. Defense counsel's closing argument stressed the centrality of credibility determinations to the jury's deliberations, asserting that "[t]he issue on the tortious interference claim . . . is do you believe Mr. Thunelius or do you believe Mr. Shaiman?" J.A. at 340. Similarly, in its instructions to the jury, the district court emphasized that "[t]here is a very sharp challenge to the credibility of Mr. Thunelius, and you will consider that carefully, as to whether you believe his testimony in court despite what are claimed to be inconsistencies with his deposition." J.A. at 374. After 93 minutes of deliberation, the jury returned a defense verdict.

**The Motion for a New Trial**

After receiving the verdict, the district court invited Raedle to move for judgment as a matter of law or for a new trial, opining that "there's absolutely no rational reason why [CAI] could not find out who made the statements [to Dreyfus] and produce evidence of that effect." J.A. at 387. Regarding Thunelius's testimony, the district court stated, "obviously that is a jury

7

question, but the fact that not one word of testimony came from a [CAI] witness as to what communications were made and by whom . . . to me . . . makes it impossible to accept this verdict as in accordance with the weight of the evidence." J.A. at 387.

Raedle subsequently moved for a new trial under Rule 59(a)(1)(A), and the district court granted the motion, concluding that the verdict was "drastically wrong, and would result in a serious injustice if allowed [to] stand." *Raedle v. Credit Agricole Indosuez*, No. 04 Civ. 2235, 2009 WL 1024238, at *4 (S.D.N.Y. Apr. 15, 2009) ("*Raedle I*"). In its opinion granting the motion, the district court summarized the evidence presented at trial before inquiring,

> [w]here does this leave the weight of the evidence? As already stated, it is a certainty that someone at CAI made a sufficiently damaging communication to Dreyfus, so that Dreyfus drew back from its quite strong desire to hire plaintiff for a very favorable position. Only one witness has testified as to what that communication was, and that is Thunelius. His testimony is that Leibig relayed to him that someone at Dreyfus had characterized plaintiff as having mental problems to the degree of being psychotic, after which Thunelius spoke directly to plaintiff's former superior who repeated basically the same thing. Balakrishnan's testimony would indicate that the person at CAI who made this communication was Shaiman. If such a description was made by CAI to Dreyfus, it was false. No one contends that plaintiff had mental problems of any kind. Neither defendant CAI nor defendant Shaiman contends that such a description of plaintiff would have had any truth to it.
>
> It is true that there were differences between the testimony of Thunelius at the trial versus his testimony on deposition. His deposition testimony was to the effect that there was a negative description of plaintiff of a personal nature, which he thought was "garbage," but he was no more specific at the deposition. In his trial testimony Thunelius was specific, and stated that he was told that plaintiff had mental issues to the degree of being psychotic. It was surely within the jury's province to consider that there was a serious question about the credibility of Thunelius. However, Thunelius was the only witness to provide the slightest clue as to what was said by CAI to Dreyfus. And even his deposition testimony, while lacking in specifics, surely supported the idea that a superior of plaintiff at CAI had made *a seriously disparaging* comment about plaintiff.

> Moreover, the testimony of Thunelius finds corroboration in the testimony of Balakrishnan. Against the testimony of Thunelius and Balakrishnan must be weighed *the total lack of explanation from the people who were really responsible for what happened – i.e., plaintiff[']s superiors at CAI, particularly Shaiman. The court simply does not credit this total denial, or total denial of any memory*.

*Id.* at *3-4 (emphasis added).

**The Second Trial**

The case was retried in March 2010. Following a four-day retrial on the tortious interference claim, the jury returned a verdict for Raedle, awarding $1,023,922 in lost wages, $600,000 in reputational damages, and $800,000 in punitive damages. Thereafter, defendants moved for judgment as a matter of law or for a new trial and to set aside the punitive damages award. The court vacated the punitive damages award, but otherwise denied the motions. *Raedle v. Credit Agricole Indosuez*, No. 04 Civ. 2235, 2010 WL 1506731, at *3 (S.D.N.Y. Apr. 14, 2010). The court also denied Raedle's application for pre-verdict interest on lost wages but awarded post-verdict, pre-judgment interest. *Raedle v. Credit Agricole Indosuez*, No. 04 Civ. 2235, 2010 WL 2367262, at *3 (S.D.N.Y. June 11, 2010). Raedle appealed the court's dismissal of the punitive damages award and denial of pre-verdict interest. Defendants cross-appealed, challenging the court's decision to set aside the first verdict and mounting a host of challenges related to the second trial. Because we hold that the district court erred in vacating the first verdict – which we now instruct the district court to reinstate – we need not reach the other issues on appeal.

9

**DISCUSSION**

We review a district court's grant of a new trial on the ground that the verdict was against the weight of the evidence for abuse of discretion. *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 634 (2d Cir. 2002). "A district court abuses its discretion when (1) its decision rests on an error of law (such as the application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision – though not necessarily the product of a legal error or a clearly erroneous factual finding – cannot be located within the range of permissible decisions." *Manley v. Ambase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003) (quotation marks omitted).

**Tortious Interference With Prospective Contractual Advantage**

In order to state a claim for tortious interference with prospective economic advantage under New York law, a plaintiff must show (1) business relations with a third party; (2) defendants' interference with those business relations; (3) that defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship. *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir. 1994).

In *Miller v. Mount Sinai Medical Center*, 733 N.Y.S.2d 26 (1st Dep't 2001), and *Jacobs v. Continuum Health Partners, Inc.*, 776 N.Y.S.2d 279 (1st Dep't 2004), the New York Appellate Division clarified the fine line separating honest and defamatory job references that can form the basis for tortious interference claims. In *Miller*, the court held that it was altogether reasonable for plaintiff's former supervisor to speak with her future supervisor about plaintiff's work performance, observing that the fact that plaintiff's former supervisor "may have given plaintiff a negative job reference or did not believe plaintiff to be a qualified candidate for the position did not constitute interference by 'wrongful means.'" 733 N.Y.S.2d at 27. The court

10

also noted that, inasmuch as plaintiff conceded that the negative reference from her former supervisor concerned plaintiff's employment duties, plaintiff "failed to allege . . . that the sole purpose for [her former supervisor's] 'interference' was to harm her." *Id.* In *Jacobs*, the court addressed a plaintiff's claim that the University of Utah had rescinded its offer of employment to her after it contacted the defendants, who were the plaintiff's former employers, for a reference. 776 N.Y.S.2d at 280. The allegedly tortious comment that led to the rescission was the defendants' description of the plaintiff as an "average" employee. *Id.* The court concluded that the plaintiff's claim for tortious interference with prospective business advantage should have been dismissed because the plaintiff failed to allege "specific facts that, if proven, would show that the communicated evaluation of plaintiff as an 'average' employee was objectively false or otherwise independently wrongful." *Id.* at 280-81.

**Rule 59(a)(1)(A) Motions**

A court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court," Fed. R. Civ. P. 59(a)(1)(A), including if the verdict is against the weight of the evidence. "[A] decision is against the weight of the evidence . . . if and only if the verdict is [(1)] seriously erroneous or [(2)] a miscarriage of justice." *Farrior*, 277 F.3d at 635; *accord DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998) ("A court considering a Rule 59 motion for a new trial . . . should only grant such a motion when the jury's verdict is egregious.") (quotation marks omitted).

On new trial motions, the trial judge may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner. *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998). However, our precedent counsels that

11

trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge "should rarely disturb a jury's evaluation of a witness's credibility," *DLC Mgmt.*, 163 F.3d at 134, and may not "freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury," *Landau*, 155 F.3d at 104. Indeed, we have stated that "[w]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992); *see also Landau*, 155 F.3d at 104-05 ("A jury's credibility assessments are entitled to deference."). *But see Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992) (upholding grant of new trial in wrongful termination case where the evidence of unsatisfactory job performance "rested almost entirely on the testimony of [appellant's] co-workers regarding his allegedly poor inter-personal skills and professional relationships" because "the district court was in a unique position to assess the credibility of the witnesses and to determine the weight which should be accorded their testimony"). As we explained in *Landau*, a trial court's power to grant a Rule 59(a)(1)(A) motion produces tension between

> two conflicting principles: the parties' Seventh Amendment right to a trial by jury and the power of the district court, also necessary to our jury system, to set aside a seriously erroneous verdict based on the weight of the evidence. *This tension is most acute where . . . the result may turn in large part on the credibility of a single witness*. While this makes the trial court's task in ruling on a new trial motion more difficult, it does not preclude the possibility that the motion may be granted. In *Sorlucco[ v. New York City Police Department*, 971 F.2d 864 (2d Cir. 1992)], the Court of Appeals [reversed the district court's grant of a new trial after finding] that the trial judge had disagreed with the jury on the credibility of a key witness *but did not explain how that difference of opinion le[d] to a miscarriage of justice*. We do not read *Sorlucco* to mean that a trial judge can never substitute its view of the evidence for that of the jury,

12

> provided the judge is convinced that the jury has reached a seriously
> erroneous result or that the verdict is a miscarriage of justice.

155 F.3d at 105 (emphasis added) (footnotes, quotation marks, and citation omitted).

What these cases teach is the high degree of deference accorded to the jury's evaluation of witness credibility, and that jury verdicts should be disturbed with great infrequency. To be sure, Rule 59(a)(1)(A) affords trial courts latitude in reviewing jury verdicts and in considering credibility when doing so. But where, as here, a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice.

The record before us does not support the district court's conclusion that the verdict "would result in a serious injustice if allowed [to] stand." *Raedle I*, 2009 WL 1024238, at *4. The court began its analysis by acknowledging the minimal and equivocal evidence relating to credibility that was presented to the jury on the most contested elements of plaintiff's claim. First, it (correctly) observed that "Thunelius was the only witness to provide the slightest clue as to what was said by CAI to Dreyfus." *Id.* Indeed, Thunelius's testimony was the sole evidence at trial that Shaiman (or anyone at CAI) interfered with Raedle's employment (1) by wrongful means or (2) with the sole purpose of harming him – as opposed merely to providing a negative but non-tortious evaluation of his performance at CAI. *See Jacobs*, 776 N.Y.S.2d at 280-81; *Miller*, 733 N.Y.S.2d at 27. Thus, Raedle's case turned on the jury's crediting Thunelius's testimony that Leibig told him that Raedle's "boss" told her that Raedle had "mental issues" – and that the reference to "mental issues" falsely suggested that Raedle had a personality disorder or mental health-related impairment.

13

Second, the district court acknowledged that "[i]t was surely within the jury's province to consider that there was a serious question about the credibility of Thunelius." *Raedle I*, 2009 WL 1024238, at \*4. Indeed, Thunelius's insistence during his deposition that he could not recall the specific words spoken by Leibig was in tension with his more specific trial testimony, which itself remained rather vague. The jury could reasonably have determined, for example, that Shaiman's alleged negative references to Raedle's "personal" and "mental" issues were in fact references to his poor interpersonal skills, leading to the reasonable inference that he "would not be a good employee for Dreyfus" – as Thunelius testified was the conclusion at the Dreyfus meeting. J.A. at 243. Such a determination finds support in Smith's and Shaiman's testimony that, while Raedle's work at CAI was analytically sound, they found his collaborative and mentoring skills lacking. While damaging reputationally and professionally, such negative reports, if true, are not necessarily tortious. Along those lines, although Thunelius's testimony found some "corroboration in the testimony of Balakrishnan," *Raedle I*, 2009 WL 1024238, at \*4, Balkshanarian's testimony corroborated only Thunelius's and Raedle's accounts that something negative was said – not something tortiously negative. And at trial, the defense had already conceded that something negative was said.[1]

In the final analysis, the only testimony regarding what was actually said came from Thunelius, and thus the entire case hinged on his credibility. Indeed, defense counsel vigorously challenged Thunelius' credibility both on cross-examination and also in closing statements. The district court squarely presented the issue to the jury in its instructions. Here, as in *Sorlucco*,

---

[1] Alternatively, based on the fact that Dreyfus eventually fired Thunelius, the jury could have concluded that Thunelius was motivated to lie by a desire to see Dreyfus embarrassed.

14

"[t]he veracity of [Thunelius'] statements . . . was a matter of credibility for the jury to resolve." 971 F.2d at 874. Plainly, in returning a defense verdict, the jury did not credit Thunelius' testimony – a view supported by the evidence.

What is more, the district court did not even seem to disagree with the jury over *Thunelius*'s credibility. Instead, it "simply [did] not credit" the "total lack of explanation from the people who were really responsible for what happened – *i.e.*, plaintiff[']s superiors at CAI, particularly Shaiman." *Id.* But if Thunelius was the "only witness to provide the slightest clue as to what was said by CAI to Dreyfus," *id.*, and if the jury disbelieved Thunelius, it is somewhat irrelevant whether the defense witnesses were lying when they claimed not to recall discussing Raedle's employment prospects. For if the jury did not credit Thunelius's version of events, in a case where Raedle bore the burden of proof, it is far from clear that an evidentiary basis existed to conclude that defendants tortiously interfered with Raedle's job offer from Dreyfus.

In any event, given that three years elapsed between "what happened" and Raedle's lawsuit, and given that "what happened" consisted of two short Dreyfus-initiated phone calls to CAI, it is certainly not "impossible" to believe the defense witnesses' "total denial of any memory," the district court's assertions to the contrary notwithstanding. *Id.* The jury could reasonably have (1) credited Shaiman's testimony that he would never have impugned Raedle on such "personal" grounds given his son's behavioral and mental health issues; (2) accepted the defense's theory that if Shaiman said anything at all, it would have been an honest – albeit potentially damaging – assessment; or (3) credited Shaiman's testimony that he offered precisely this type of reference to Merrill Lynch, a reference he remembered giving because he was personally acquainted with the party seeking it. None of this testimony was bizarre, far-fetched,

15

"patently incredible or defi[ant of] physical realities." *Cf. United States v. Coté*, 544 F.3d 88, 101 (2d Cir. 2008) (quotation marks omitted). The jury was not compelled to accept it. But it was free to – and apparently did – accept all or a critical portion of it. The verdict, grounded in this fashion in the record, cannot be said to have been either egregious or a serious miscarriage of justice. In granting the Rule 59 motion, the district court abused its discretion.

**CONCLUSION**

The order of the district court granting the new trial is reversed; the judgment entered on the basis of the second verdict is vacated; and the case is remanded to the district court with instructions to reinstate the first verdict and to enter judgment in defendants' favor in accordance with that verdict.