Mark EDWARDS, Plaintiff,

v.

SCHRADER–BRIDGEPORT
INTERNATIONAL, INC.,
Defendant.

No. 5:98–CV–681(FJS/GLS).

United States District Court,
N.D. New York.

June 4, 2002.

Hancock & Estabrook, LLP, Syracuse, NY, James E. Hughes, of counsel, for Plaintiff.

Pedersen & Houpt, P.C., Chicago, IL, Arthur M. Holtzman, of counsel, Hiscock & Barclay, LLP, Syracuse, NY, Alan R. Peterman, of counsel, for Defendant.

## MEMORANDUM–DECISION AND ORDER

SCULLIN, Chief Judge.

## I. INTRODUCTION

Certain issues in this case were tried to a jury on February 4–6, 2002, while others

**5**

were reserved for the Court's determination. Presently before the Court are several post-trial motions. First, with respect to the issues that were tried to the jury, Plaintiff moves (1) for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure (a) with respect to the $35,000 Success Bonus and (b) with respect to the unvested stock options worth $30,393.33 on the ground that there is no legally sufficient evidentiary basis for a reasonable jury to find for Defendant on these issues; and (2) alternatively, for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure with respect to the $35,000 Success Bonus on the grounds that (a) the Court's instructions to the jury did not provide sufficient guidance as to what constituted a resignation and (b) Plaintiff was precluded from introducing evidence of his strong performance as plant manager.

In addition, Defendant moves for a judgment dismissing the claims that the Court must decide in the first instance. With respect to these same claims, Plaintiff moves (1) for judgment as a matter of law with respect to the benefit due under the Executive Severance Policy on the ground that he did not resign and (2) for judgment as a matter of law with respect to his claim for prejudgment interest due as a result of Defendant's delay in paying him the following amounts to which he was entitled: (a) $10,080.68 representing the liquidated value of his vested options in 1,667 shares of common stock, (b) $3,015.01 representing reimbursement of business expenses he incurred on behalf of Defendant prior to his separation from service, and (c) $2,182.90 representing payment for eleven days of unused vacation time.

The Court will address each of these motions in turn.

## II. DISCUSSION

### A. Judgment as a matter of law

When a court is faced with a Rule 50 motion after the jury has returned its verdict, "the district court may set aside the verdict only where there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or ... such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.'" *Harris v. Niagara Mohawk Power Corp.*, 252 F.3d 592, 597 (2d Cir.2001) (quoting *Song*, 957 F.2d at 1046 (quoting *Mattivi v. South African Marine Corp.*, 618 F.2d 163, 168 (2d Cir.1980) (internal quotation marks omitted))) (other citations omitted). In other words, a court should deny a Rule 50(b) motion "unless 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.'" *Id.* (quoting *Samuels*, 992 F.2d at 14 (quoting *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970) (internal quotation marks omitted))) (other citation omitted).

### 1. Plaintiff's resignation

██ Plaintiff contends that there is no legally sufficient basis for a reasonable jury to find that he resigned. According to Plaintiff, all of the evidence indicates that he expressed only a conditional intention to resign in the future. To support this argument, Plaintiff relies on the fact that when he stated: "I'm quitting. I'm leaving this organization" during his March 20, 1998 telephone conference with Wiggins and Giudice, Giudice told him that "he should formalize his resignation and anything that [Giudice] cho[ ]se to discuss or take exception to, that [Giudice] would

get back to him on it." *See* Transcript of Deposition of Marty Giudice ("Giudice Tr."), dated April 28, 1999, at 108. Plaintiff also relies upon Giudice's contemporaneous notes of the telephone conference, in which he wrote; "I advised [Plaintiff] to formalize his resignation as he saw fit and I would respond accordingly to any terms he included." *See* Trial Exhibit P–34. Based upon Giudice's statements that he would respond to any conditions Plaintiff attached to his resignation, Plaintiff contends that there was "no meeting of the minds" with respect to his resignation and, therefore, under fundamental notions of contract law, his actions did not constitute a voluntary resignation. Alternatively, Plaintiff argues that even if he stated that he was going to leave the company, he took no actions which would have been consistent with a resignation and, therefore, a jury could not have found that he intended to resign on March 20, 1998.

Plaintiff has failed to meet his burden under Rule 50 to demonstrate that the jury's conclusion that he resigned on March 20, 1998, was "the result of sheer surmise and conjecture[.]" *See Harris*, 252 F.3d at 597. Plaintiff is asking the Court to do what a court cannot do on a Rule 50 motion—weigh the evidence and make credibility determinations. Both Giudice and Wiggins testified that Plaintiff resigned during their telephone conference on March 20, 1998. *See* Transcript of Deposition of James D. Wiggins ("Wiggins Tr."), dated April 9, 1999, at 196 (stating that Plaintiff stated: "I'm quitting. I'm leaving the organization."); Giudice Tr. at 108 (stating that Plaintiff "told us he didn't feel he could continue to fulfill his responsibilities as plant manager and therefore resigned."). Wiggins also testified that "We accepted his resignation and we asked him to put it in writing." *See* Wiggins Tr. at 196. In addition, Prouty and LaPointe, two of Plaintiff's subordinates, testified

that Plaintiff told them that he had resigned. Although Plaintiff testified that he only told them that he was resigning to protect his reputation, he does not deny making the statement.

Alternatively, Plaintiff argues that his resignation was conditional on March 20, 1998, because the parties had not agreed to all the terms. However, the jury was free to reject this argument in light of all of the evidence and to find that although the parties may not have agreed on the date of Plaintiff's departure, this did not affect the validity of Plaintiff's resignation.

Given the proof adduced at trial, the Court concludes that it cannot be said that there is a complete absence of evidence to support the jury's conclusion that Plaintiff resigned on March 20, 1998. Accordingly, the Court denies Plaintiff's motion for judgment as matter of law with respect to the issue of his resignation.

### 2. The $35,000 Success Bonus

The Court need not address the issue of whether Plaintiff was entitled to payment of a $35,000 Success Bonus because, as Plaintiff concedes, he would only be entitled to this bonus if Defendant terminated him to avoid paying him this benefit. Since the jury concluded that Plaintiff resigned and the Court has held that there was sufficient evidence to support this determination, Plaintiff's motion with respect to this issue is moot. Accordingly, the Court denies Plaintiff's motion for judgment as a matter of law with respect to his entitlement to a success bonus.

### 3. Unvested stock options

■ Plaintiff asserts that the Court should not have been submitted the issue of his entitlement to the liquidated value of his unvested stock options to the jury because the Stock Option Agreements are

clear and unambiguous. Therefore, according to Plaintiff, the Court should have determined, as a matter of law, whether these agreements entitled him to receive the liquidated value of his unvested stock options.

Plaintiff is, in effect, asking the Court to reconsider its previous ruling that the Stock Option Agreements were ambiguous and that, therefore, their interpretation was an issue for the jury. The Court has reviewed these agreements for a second time and adheres to its previous conclusion that they are ambiguous. Paragraph 2(c)(ii) of the Agreement states

(c) Normal Vesting; Performance Targets; Acceleration of Vesting.

(ii) Acceleration of Vesting. Notwithstanding anything contained in this Agreement to the contrary, all unvested Options shall automatically vest upon a Sale of the Company subject to your continued employment with the Company or any Subsidiary through the date 90 days prior to such Sale of the Company.

On the other hand, paragraph (d) of the Agreement states

(d) Termination of Option. In no event shall any part of your Option be exercisable after the Expiration Date set forth in Section 2(a). Except as provided in Section 2(c)(ii), if your employment by the Company or any Subsidiary terminates for any reason other than for Cause, that portion of your Option that is not vested and exercisable on the date of termination of your employment shall expire and be forfeited, and the portion of your Option that is vested and exercisable on the date of such termination shall expire, to the extent not theretofore exercised, on the first anniversary of such date of termination. If your employment with the Company or any Subsidiary terminates for Cause, all of your Options not previously exercised shall expire and be forfeited whether or not vested and exercisable.

*See* Trial Exhibits P–7 and P–18.

The Court finds that the intent of these two paragraphs is ambiguous. One states that an employee's options automatically vest if the employee is employed with the Company through the date ninety days prior to the Sale of the Company. The other paragraph, however, provides that if an employee's employment is terminated for any reason other than cause, the unvested portion of the employee's options is forfeited. These paragraphs are subject to two reasonable interpretations. First, as Plaintiff asserts, they could mean that as long as an employee was employed ninety days prior to the sale of the company, he is entitled to receive the liquidated value of his unvested stock options upon the sale of the company even if he is no longer employed by the company on that date. Another reasonable interpretation is the one that Defendant offers, which is that in order for an employee to receive the liquidated value of his unvested stock options upon the sale of the company, he must be employed with the company ninety dates prior to the sale and on the date that the company is sold.

The jury reviewed the Stock Option Agreements as well as the January 16, 1998 letter from Wiggins, which further explained the circumstances under which an employee's unvested stock options would vest. That letter states, in pertinent part,

The Board of Directors, on December 12, 1997, created several programs for the benefit of management in the event of a change of control of the Company. If a change of control occurs on or before December 31, 1998, **and you are employed through the date of the change of control**, the following will

occur: (1) all outstanding, unvested options to purchase common stock of the Company by you shall automatically vest in full as of the date of the event . . . *See* Trial Exhibit, P–23 (emphasis added).

Since the Stock Option Agreements are ambiguous, it was appropriate for the jury to rely upon the January 16, 1998 letter to assist it in resolving the ambiguity in those agreements. Moreover, the evidence was sufficient for the jury to conclude that when read together these documents indicate that an employee had to be employed both ninety days before the date of the sale of the company and through the date of the change of control. Once the jury reached this conclusion and also found that Plaintiff resigned on March 20, 1998, prior to the date of the change of control, then it was reasonable for the jury to conclude that Plaintiff was not entitled to the liquidated value of his unvested stock options. Accordingly, the Court denies Plaintiff's motion for judgment as a matter of law with respect to this claim.

## B. Motion for a new trial

Unlike a motion for judgment as a matter of law, on a motion for a new trial under Rule 59 of the Federal Rules of Civil Procedure, "the trial court may independently 'weigh the evidence' without favor to the non-movant[.]" *Finn–Verburg v. N.Y. State Dep't of Labor,* 165 F.Supp.2d 223, 228 (N.D.N.Y.2001) (citation omitted). However, a court " 'should be least inclined to disturb a jury's verdict, based entirely or primarily upon witness credibility, where the conflicting accounts of the witnesses are equally plausible (or implausible), and there is no independent evidence in the trial record' requiring the court to credit one version of events over another." *Id.* (quoting *Ricciuti v. New York City Transit Authority,* 70 F.Supp.2d 300, 308 (S.D.N.Y.1999)). Thus, "[w]here

the jury resolved conflicting versions of events in favor of one party, a new trial is appropriate only where one 'conflicting account is so inherently implausible as to tax credulity, or there is independent evidence in the trial record' such that finding for one party, instead of another, would 'lead to a miscarriage of justice.' " *Id.* (quoting [*Ricciuti,* 70 F.Supp.2d] at 308).

Nonetheless, in addressing a Rule 59 motion, the court may "independently weigh the evidence presented at trial to determine whether the jury's verdict is 'seriously erroneous' or resulted in a 'miscarriage of justice.' " *Id.* (quoting *Sorlucco v. New York City Police Department,* 971 F.2d 864, 875 (2d Cir.1992)). In doing so, the court "is afforded considerable discretion. On a Rule 59 motion, 'the trial judge is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner.' " *Id.* (quoting *Bevevino v. Saydjari,* 574 F.2d 676, 684 (2d Cir.1978)). However, "the mere fact that the trial judge disagrees with the jury's verdict is not a sufficient basis to grant a new trial." *Id.* (citing *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 691 (2d Cir.1983)). A court should grant a new trial "only where the court 'is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.' " *Id.* (quoting *Sorlucco,* 971 F.2d at 875 (quoting *Smith v. Lightning Bolt Productions, Inc.,* 861 F.2d 363, 370 (2d Cir.1988))).

In the present case, Plaintiff contends that he is entitled to a new trial with respect to the issue of his entitlement to the $35,000 Success Bonus because (1) the Court's instructions to the jury did not provide sufficient guidance as to what constitutes a resignation and (2) Plaintiff was precluded from introducing evidence of his strong performance as plant manager.

The Court will discuss each of Plaintiff's arguments in turn.

### 1. Jury instructions

■ Plaintiff claims that the Court's jury instructions were defective because they were devoid of any guidance regarding the meaning of the term "resignation," including that the resignation had to be voluntary. The Court's instruction with regard to this issue was:

As noted, Defendant contends that Plaintiff resigned on March 20, 1998, prior to the date of the change of control, that is April 30, 1998. To the contrary, Plaintiff contends that Defendant terminated his employment on March 20, 1998 and that a substantial motivating factor in Defendant's decision to terminate him was Defendant's desire to avoid paying him the Success Bonus promised to him in the January 16, 1998 Letter Agreement.

If you find that Plaintiff has demonstrated, by a preponderance of the evidence, that he did not resign and that he would have been employed by Defendant on the date of the change of control if Defendant had not acted in bad faith in terminating him to avoid paying him the Success Bonus, then you must find for Plaintiff on this claim. On the other hand, if you find that (1) Plaintiff resigned on March 20, 1998 or that (2) Defendant terminated Plaintiff's employment on March 20, 1998 for reasons other than to avoid paying him the Success Bonus, then you must find for Defendant on this claim.

Plaintiff has cited no authority in either New York or the Second Circuit to support his claim that a jury instruction is deficient because it does not define the term "resignation." The term "resignation" is a commonly-used term within the comprehension of the ordinary person. Moreover, the Court set forth the parties' alternative arguments as to what occurred on March 20, 1998, specifically distinguishing between resignation and termination and thereby putting the term "resignation" in context. Under these circumstances, the Court concludes that its instructions adequately provided the jury with the law it needed to determine whether Plaintiff had resigned or was terminated from his employment on March 20, 1998. Accordingly, the Court denies Plaintiff's motion for a new trial on this ground.

### 2. Evidence about Plaintiff's performance

■ Plaintiff asserts that it was error for the Court not to allow him to testify about his performance.[1] Defendant stipulated, prior to trial, that there was nothing about Plaintiff's performance that would provide grounds for termination for cause. In fact, Defendant's sole defense to Plaintiff's claims was that Plaintiff resigned his position. Therefore, any evidence regarding Plaintiff's performance was irrelevant and possibly would have confused the jury. Accordingly, the Court denies Plaintiff's motion for a new trial on this ground.

### C. Issues for the Court's determination

### 1. Plaintiff's claim for payment under Defendant's Executive Severance Policy

■ In his third cause of action, Plaintiff alleges that his employment with Defendant was terminated "with the specific intention to interfere with Plaintiff's attainment of his rights to benefits" under, among other things, the severance policy.

---

1. The Court finds this argument interesting in light of Plaintiff's motion *in limine,* which sought to preclude Defendant from introducing any evidence regarding his performance.

Defendant's Executive Severance Policy is an employee benefit plan covered by ERISA. Section II of the Severance Policy provides that

> [d]uring the period that this Severance Policy is in effect, if an Employee's employment is terminated by either of the Companies other than for Cause or in the event the Employee resigns by reason of a Constructive Termination other than due to death or permanent disability, the Companies shall pay to such Employee a severance benefit equal to one (1) months' salary (at the Employee's then effective base salary rate) for each year of complete service with the Companies (including those years of service with the Companies completed prior to adoption of the Severance Policy and including years of service with Schrader Inc. and Bridge Products, Inc.). The minimum severance payable hereunder shall be three (3) months' salary and the maximum severance payable hereunder shall be twelve (12) months' salary. Such benefit shall be paid on a monthly basis following such Termination or Constructive Termination.

*See* Executive Severance Policy, attached to Stipulation as Exhibit 1, at 2.

Plaintiff claims that the Court need only find that he did not resign to find him eligible for benefits under this policy since, by its terms, it obligates Defendant to pay him unless he was terminated for "cause" or resigned due to a "constructive termination."

Plaintiff's premise is correct; if the Court were to conclude that Plaintiff did not resign, he would be entitled to receive benefits under Defendant's Severance Policy. However, having reviewed the record in its entirety, the Court finds that, although Plaintiff testified that he did not resign, the testimony of Giudice, Wiggins, Prouty and LaPointe to the contrary is more persuasive. Therefore, the Court holds that Plaintiff has failed to establish, by a preponderance of the evidence, that he is entitled to any benefits under Defendant's Executive Severance Policy. Accordingly, the Court dismisses Plaintiff's third cause of action.

### 2. Plaintiff's claim for prejudgment interest with regard to Defendant's allegedly delayed payment to Plaintiff of the liquidated value of his vested options in 1,667 shares of common stock [2]

■ Plaintiff contends that he is entitled to prejudgment interest on the liquidated value of his vested options in 1,667 shares of common stock because Defendant inexcusably delayed paying him this amount. Defendant disagrees, arguing that any delay in its payment to Plaintiff for his vested stock options was due to Plaintiff's failure to execute the required documentation, which would have entitled him to receive the payment.

The crux of the parties' disagreement centers on the meaning of the Letter of Transmittal attached to the May 8, 1998 letter that Defendant's Vice President and CFO, Gary M. Cademartori, sent to Plaintiff. In his letter, Cademartori advised Plaintiff that in order for him to receive the $6.0472 per share cash payment he had to "(A) deliver the enclosed Letter of Transmittal, appropriately completed to the Company and (b) surrender such Shares by delivering the stock certificate(s) (which, prior to the Merger, had evidenced such Shares) to the Company."

---

**2.** Plaintiff concedes that his claim for the liquidated value of his vested options in 1,667 shares of common stock does not arise under New York Labor Law and, therefore, there is no basis for a claim for attorneys' fees.

*See* Letter of Gary M. Cademartori to Mark R. Edwards, dated May 8, 1998, attached to Stipulation as Exhibit 3, at 1. The relevant part of the Letter of Transmittal states that

> [t]he undersigned hereby represents, warrants and agrees with the parties to the Merger Agreement that (i) the undersigned acknowledges that it has received and read a copy of the Merger Agreement, together with all schedules and exhibits thereto, (ii) the undersigned has full power, right and authority to vote, submit, sell, assign and transfer the Shares represented by the enclosed certificate without restriction, (iii) the transfer of the Shares does not violate, conflict with or result in a breach of any provision of any law, statute, rule, regulation, order, permit, judgment, ruling, decree or other decision of any court or governmental entity or agency binding on the undersigned, (iv) the undersigned owns the Shares represented by the enclosed certificates free and clear of any liens or encumbrances, (v) the undersigned has not sold, transferred or otherwise disposed of or in any way encumbered any of such undersigned's Shares prior to the date hereof, (vi) this Transmittal has been duly executed and delivered by the undersigned and constitutes the valid and binding obligation of it and is enforceable against it in accordance with the terms hereof, (vii) **as of the date hereof,** there are **no claims, charges, complaints, actions, causes of action, suits, proceedings, demands, costs, losses, damages, liabilities or expenses which the undersigned has asserted or could,** to the best knowledge of the undersigned, **assert against the Company** or any Company Subsidiary and their respective officers, directors, employees, legal advisors or agents **connected with or arising out of any act or omission of the Company** or any Company Subsidiary or their respective officers, directors, employees, legal advisors or agents **except for claims for unpaid salary, accrued vacation pay, accrued benefits and similar matters** and (viii) the undersigned **releases, remises and acquits and forever discharges each of the Company,** any Company Subsidiary, the Merger Sub, the Parent, the corporation surviving the Merger, and each of their respective officers, directors and employees **from any and all actions, liabilities, charges, complaints, causes of action, suits, proceedings, demands, costs, losses, damages, expenses and all other claims whatsoever** (whether in contract, tort, pursuant to statute, known or unknown) of whatever nature and kind arising against such party by the undersigned (including pursuant to any appraisal rights proceedings) (collectively, "Claims"), **based in whole or in part on any matter occurring on or prior to the date hereof,** it being understood that this is **intended to be a general release** and the undersigned intends to be legally bound by the same.

*See* Letter of Transmittal, attached to Stipulation as Exhibit 3 (emphasis added).

■■■ Whether Plaintiff is entitled to prejudgment interest on this claim is a very close call. Certainly, Defendant's requirement that Plaintiff surrender the stock certificates prior to receiving the liquidated value of the shares which those certificates represented and that he warrant that he owned the shares is reasonable and prudent business practice.[3] What

---

3. The Court notes, however, that Defendant's argument that it could not provide Plaintiff with the liquidated value of these stock options until he turned over the stock certifi-

is problematic, however, is the two seemingly contradictory releases contained in the Letter of Transmittal attached to Cademartori's letter. Paragraph (vii) appears to exempt claims for "unpaid salary, accrued vacation pay, accrued benefits and similar matters" from the release sought in that paragraph. However, paragraph (viii) requires a release of all claims "based in whole or in part on any matter occurring on or prior to the date hereof[.]" Given the explicit language of paragraph (viii) that it was "intended to be a general release," the Court finds that it was reasonable for Plaintiff to conclude that if he signed the Letter of Transmittal he would be releasing Defendant from any and all claims that he might have. Since Plaintiff had already filed the present action, he could not sign the general release unless he decided not to proceed with this action or, at the very least, not to proceed with his claims predicated on his entitlement to the Success Bonus and to the benefit included in the Executive Severance Policy. Moreover, Defendant has not demonstrated what relationship, if any, there is between Plaintiff's entitlement to receive the liquidated value of his vested stock options and any other claims he might have against Defendant, which would warrant requiring Plaintiff to sign a general release. Accordingly, the Court finds that Plaintiff is entitled to prejudgment interest on the liquidated value of his vested stock options from May 8, 1998, the date of Cademartori's letter, until August 11, 2000, the date that Defendant sent Plaintiff's counsel a check for the liquidated value of these vested stock options. Such interest is to be calculated at the rate of nine percent per annum as set forth in New York Civil Practice Law and Rules § 5004.

*See* N.Y. C.P.L.R. § 5004 (McKinney 1992).

### 3. *Plaintiff's claim for prejudgment interest and attorneys' fees in connection with Defendant's alleged delay in paying Plaintiff for his unreimbursed business expenses*

■ Defendant contends that any delay in reimbursing Plaintiff for his business expenses was due to Plaintiff's delay in supplying the documentation necessary to support his claim for these expenses. Moreover, Defendant claims that business expenses are not wages under Article VI of New York Labor Law and, therefore, there is no basis for Plaintiff's claim for attorneys' fees.

To support its position that it was Plaintiff's inaction that caused the delay in his receiving reimbursement for his business expenses, Defendant notes, first of all, that Plaintiff never requested reimbursement for these expenses while he was employed. In addition, Defendant points to the fact that on July 30, 1998, it requested information and documents with respect to Plaintiff's claim for approximately $5,000 in expenses and disbursements. On September 21, 1998, Plaintiff responded, stating that "as the specific items or dollar amounts cannot be ascertained, plaintiff will supplement this response as information is made available." Moreover, at Plaintiff's deposition on May 11, 1999, Plaintiff's counsel stated that "[w]ith respect to the claim of $5,000 in disbursements that we have not already—we will give you a description of the folder containing documentation that [Plaintiff] needs to detail his claim for disbursements. In addition, we will detail

---

cates is somewhat undermined by the fact that in the end Defendant did just that. Defendant sent a check to Plaintiff's counsel, covering the liquidated value of these options,

on August 11, 2000, but Plaintiff did not tender the stock certificates until January 14, 2002.

to the extent we currently can without those records. That will be done shortly."

Following his deposition, Plaintiff was provided with access to his old office.[4] Plaintiff apparently located some documents that were related to this case. Defendant sent originals of these documents to Plaintiff's counsel on June 3, 1999. On November 4, 1999, a copy of these receipts, the originals of which had already been produced, were offered to Plaintiff's counsel.

On June 5, 2000, Defendant's counsel wrote to Plaintiff's counsel advising him that some of the claimed expenses had been previously reimbursed to Plaintiff and asking for additional detail on some of the other claims. As to the claims not in dispute, Defendant's counsel offered to issue a check in the amount of $2,904.39. On June 26, 2000, Plaintiff's counsel responded, acknowledging that some of the claims were duplicates and requesting additional reimbursements. On August 11, 2000, Defendant sent a check covering the expenses to Plaintiff's counsel. Plaintiff never cashed this check. On December 5, 2001, at the request of Plaintiff's counsel, Defendant reissued the check to Plaintiff.

Plaintiff asserts that unreimbursed business expenses constitute wages under New York Labor Law and that Defendant had a duty to expedite processing and payment of these expenses. Plaintiff asserts that initially Defendant's counsel agreed to process Plaintiff's claim for unreimbursed expenses informally, but that, after this proved unworkable, Plaintiff was required to process this claim through litigation. Although Plaintiff concedes that Defendant offered to reimburse his business expenses in a letter dated August 11, 2000, he asserts that this letter contained a general release of such claims, which he

was unwilling to provide. According to Plaintiff, Defendant did not unconditionally tender reimbursement of his business expenses until December 5, 2001. Therefore, Plaintiff seeks prejudgment interest from the date of his separation until that date.

Under § 190 of New York Labor Law, the term "wages" is defined as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis. The term 'wages' also includes benefits or wage supplements as defined in section one hundred ninety-eight-c of this article, . . ." N.Y. Labor Law § 190(1) (McKinney 1986 & Supp.2002). Section 198–c of New York Labor Law defines "benefits or wage supplements" to include "reimbursement for expenses; health, welfare and retirement benefits; and vacation, separation or holiday pay." N.Y. Labor Law § 198–c(2) (McKinney 1986 & Supp.2002). However, § 198–c, which makes it a misdemeanor for an employer to "neglect[ ] or refuse[ ] to pay the amount or amounts necessary to provide such benefits or furnish such supplements within thirty days after such payments are required to be made," also provides that "[t]his section shall not apply to any person in a bona fide executive, administrative, or professional capacity whose earnings are in excess of six hundred dollars a week." N.Y. Labor Law § 198–c(1), (3) (McKinney 1986 & Supp.2002).

Although Labor Law § 190 and § 198–c together define "wages" to include reimbursement of expenses as a general matter, this general rule does not apply to the present case. Rather, because Plaintiff is an executive, the exception in § 198–c(3) applies and, therefore, as it relates to

---

4. Jack Stewart, Defendant's former Vice President of Human Resources, testified that he offered to meet Plaintiff at the plant on March 30, 1998, but Plaintiff did not show up.

**14**

Plaintiff, reimbursement of expenses is not included in the definition of wages under § 190. *See Cohen v. ACM Med. Lab., Inc.*, 178 Misc.2d 130, 135, 678 N.Y.S.2d 432 (Sup.Ct.1998) (holding that with respect to separation pay, "[i]f the prohibition in Section 198–c applies due to the person being in this exempt administrative class, then separation pay is not included in the definition of wages under Section 190"), *aff'd without opin.*, 265 A.D.2d 839, 696 N.Y.S.2d 744 (4th Dep't 1999); *Gerzog v. London Fog Corp.*, 907 F.Supp. 590, 603 (E.D.N.Y.1995) (dismissing the plaintiff's claim for accrued vacation pay under § 198–c on the ground that the statute explicitly provides that it does not apply to persons in executive positions whose earnings were more than $600 a week). Accordingly, the Court holds that Plaintiff's claim for unreimbursed business expenses does not arise under Article VI of New York Labor Law and, therefore, the Court dismisses Plaintiff's claim for attorneys' fees with respect to his claim for reimbursement of these expenses.

With regard to Plaintiff's claim for prejudgment interest on the reimbursement amount, the Court finds that any delay that occurred in Plaintiff receiving payment was the result of his failure to provide Defendant with the appropriate information needed to reimburse him for these expenses in a timely manner. Accordingly, the Court dismisses Plaintiff's claim for prejudgment interest with respect to the reimbursement for his business expenses.

### 4. *Plaintiff's claim for prejudgment interest and attorneys' fees in connection with his claim for payment for unused vacation time*

Defendant contends that any delay in its payment to Plaintiff for his unused vacation time was due solely to Plaintiff's refusal to release any future claims for vacation pay in exchange for payment. Mr. Stewart, who did not have any records that indicated how much unused vacation time Plaintiff had accrued, testified at trial that when he talked to Plaintiff in March 1998, he asked him how many vacation days he had not used. At his deposition, Plaintiff testified about this conversation: "I believe he started asking about vacation, and I said, 'listen,' you know, 'you can pay me vacation if you want, do whatever you want, because I need help.'" According to Defendant, the first indication of the number of days for which Plaintiff was seeking payment occurred in Plaintiff's supplemental interrogatory responses filed on March 22, 2000. On June 5, 2000, Defendant's counsel wrote to Plaintiff's counsel asking for more information about the claim for eleven days of unused vacation time. On June 26, 2000, Plaintiff's counsel advised Defendant's counsel that although Plaintiff could "find no written documentation" with regard to the amount of vacation to which he was entitled, his recollection was that it was eleven days. On August 11, 2000, Defendant sent a check, which included the $2,182.90 for unused vacation time, to Plaintiff's counsel and requested a release. Plaintiff never cashed the check. On December 5, 2001, at the request of Plaintiff's counsel, Defendant reissued the check.

Plaintiff, on the other hand, testified at trial that on March 20, 1998, Mr. Stewart called and told him that he would be paid for fifteen days of unused vacation time as part of his final pay check. *See* Trial Tr. at 8. Plaintiff claims that Defendant did not unconditionally tender reimbursement for his unused vacation time until December 5, 2001. In addition to prejudgment interest from the date of his separation to December 5, 2001, Plaintiff seeks costs and liquidated damages under New York Labor Law § 198 for Defendant's failure to

timely pay him for the unused vacation time.

Although generally vacation pay would be included within the definition of "wages" for purposes of New York Labor Law, in this particular case because Plaintiff is an executive it is not. *See Gerzog,* 907 F.Supp. at 603. Therefore, the Court concludes that Plaintiff's claim for vacation pay does not arise under Article VI of New York Labor Law and, thus, there is no basis for his claim for attorneys' fees. Moreover, because Plaintiff did not have an employment contract, but rather was an at-will employee, he possesses no entitlement to vacation pay. In *Grisetti v. Super Value, Inc.,* 189 Misc.2d 800, 736 N.Y.S.2d 835 (2001), the court stated that "[t]here is a distinction between vacation pay and vacation or personal time. While vacation pay is considered additional compensation for labor, the right to receive vacation or personal time is waivable." *Id.* at 801, 736 N.Y.S.2d 835 (citations omitted). The court explained further that "[a]ny rights incidental to vacation time, such as the option to receive payment in lieu thereof or the carrying over of same to the following year, is dependent on the employment contract." *Id.* Since the plaintiff had not established that his employment contract required his employer to pay him for unused vacation time, the court found that he was not entitled to receive payment for such time.

Plaintiff attempts to distinguish *Grisetti* by arguing that Defendant has never asserted that he was not entitled to payment for unused vacation time. While this may be true, it is Plaintiff's burden to establish that Defendant was **required** to pay him for such time in order to state a claim against Defendant for failure to do so in a timely manner. Plaintiff has not even attempted to make such a showing. Therefore, despite the fact that Defendant paid

Plaintiff for eleven days of unused vacation time, Defendant was under no contractual obligation to do so, and, thus, the Court finds that Plaintiff is not entitled to prejudgment interest on this amount. Accordingly, the Court dismisses this claim.

### III. CONCLUSION

After carefully considering the record in this matter, including the evidence adduced at trial and the parties' post-trial briefs, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Plaintiff's motion for judgment as a matter of law with respect to those issues that were tried to the jury is **DENIED** in its entirety; and the Court further

**ORDERS** that Plaintiff's motion for a new trial is **DENIED** in its entirety; and the Court further

**ORDERS** that Plaintiff's claim for payment under Defendant's Executive Severance Policy is **DISMISSED**; and the Court further

**ORDERS** that Plaintiff's claim for attorneys' fees in connection with the payment of the liquidated value of his vested options in 1,667 shares of common stock is **DISMISSED**; and the Court further

**ORDERS** that Defendant is to pay Plaintiff prejudgment interest on the liquidated value of his vested options in 1,667 shares of common stock at a rate of nine per cent per annum for the period from May 8, 1998 until August 11, 2000; and the Court further

**ORDERS** that Plaintiff's claim for prejudgment interest and attorneys' fees in connection with his claim for unreimbursed business expenses is **DISMISSED**; and the Court further

**ORDERS** that Plaintiff's claim for prejudgment interest and attorneys' fees in

connection with his claim for payment for eleven days of unused vacation time is **DISMISSED;** and the Court further

**ORDERS** that the Clerk of the Court is to amend the judgment in accordance with this Memorandum–Decision and Order and close this case.

**IT IS SO ORDERED.**