JED S. RAKOFF, UNITED STATES DISTRICT JUDGE
Before the Court are two post-trial motions from plaintiff Can't Live Without It, LLC ("S'well"). S'well had brought two sets of claims against defendant ETS Express, Inc. ("ETS"), both stemming from the fact that ETS manufactures the Force Bottle, which has the same shape as plaintiff's S'well Bottle.[1] First, S'well claimed that ETS infringed on S'well's trade dress rights in the S'well Bottle in violation of the Lanham Act. Second, S'well claimed that ETS sold Force Bottles to customers who requested S'well Bottles without apprising them of the different origin, and even falsely told purchasers that Force Bottles were associated with S'well Bottles, and that it did all this in bad faith, in violation of New York's common law of unfair competition.
Following a seven-day trial, the jury found the defendant not liable on all claims. ECF No. 127. Judgment on S'well's claims was thereafter entered in favor of ETS. ECF No. 144. S'well timely moved pursuant to Federal Rule of Civil Procedure 50(b) for judgment as a matter of law on its unfair competition claim, ECF No. 147, and pursuant to Rule 59(a)(1) for a new trial on its trade dress claims, ECF No. 146. For the reasons that follow, the Court denies both motions.
I. Motion for Judgment as a Matter of Law
Under Rule 50, a court may overturn a jury's verdict only if there is "such a complete absence of evidence supporting *437 the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." Cash v. Cty. of Erie, 654 F.3d 324, 333 (2d Cir. 2011).[2] In analyzing a Rule 50 motion, a court must review the entire record and draw all reasonable inferences in favor of the nonmovant. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe," and should "give credence to the evidence favoring the nonmovant." Id. at 151, 120 S.Ct. 2097.
S'well moves for judgment as a matter of law only with respect to its unfair competition claims under New York common law. S'well presented evidence of two ways in which ETS may have violated this law: (1) selling Force Bottles to purchasers who asked for and wanted S'well Bottles, without informing them that they were actually selling them Force Bottles, and (2) misleadingly suggesting to some purchasers that Force Bottles were affiliated with the company or brand S'well. New York requires that the defendants have engaged in this misleading behavior in bad faith. Mere negligence or recklessness will not suffice; ETS must have acted with a dishonest purpose. See Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co., 1 F.Supp.3d 224, 275 (S.D.N.Y. 2014), aff'd 610 Fed.Appx. 69 (2d Cir. 2015).
A. Intentionally Selling Force Bottles to Customers Who Requested S'well Bottles
S'well presented significant evidence at trial that customers on several occasions used the word "S'well" when placing orders with ETS, and that ETS filled those orders with Force Bottles. S'well introduced numerous emails from customers requesting "S'well" bottles in which ETS employees did not appear to inform the customer that ETS only sold Force Bottles. See Exs. P-28, P-55, P-69, P-81, P-143, P-145. And several ETS employees testified (by live testimony or video deposition) that they often received orders from customers who used the word "S'well" to describe the bottles they wanted, and that they sent those customers Force Bottles. See Deposition of Jennifer Campolini 27:20-29:4 ("Campolini Dep."); Deposition of Adam Stone 178:17-180:25; Tr. 564:19-565:10 (testimony of Jeffrey Hinds).
However, ETS employees also testified that they believed that customers knew that they were ordering Force Bottles, and only used the word "S'well" because they wanted to communicate that they wanted the ETS equivalent of that better known brand. ETS CEO Sharon Eyal testified that some distributors "refer to the shape as what the brand name is," but they "know we don't sell S'well bottles. They know they are getting a H2GO Force." Tr. 338:16-21; see also 435:17-436:3 (testimony of Adam Kovar) ("The end buyer sees things in retail, comes back to the distributor, they come back to us, 'Hey, I saw this in retail, what do you have that's most similar?', and so sometimes they'll use that term."). Several ETS employees also testified that, if they believed the customer was *438 under the wrong impression, they would inform that customer that they do not carry S'well Bottles. See Campolini Dep. at 27:15-17; Deposition of Cristina Ysselstein 18:13-19. One even testified that repeat customers "get upset sometimes if you keep asking them to confirm what item they're looking for," saying things like, " 'Dang it, Jen. You know what I'm looking for. Stop asking me. You know it's the Force.' " Campolini Dep. 54:3-10.
S'well argues that this testimony is insufficient for a reasonable juror to find that the customers in fact wanted Force and not S'well Bottles, as ETS employees cannot know what is in the mind of their customers. S'well cites Coca-Cola Co. v. Overland, Inc., in which the Ninth Circuit rejected affidavits from the defendant's employees to the effect that they believed customers who ordered "Coke" used the term in the generic sense, rather than specifically ordering Coca-Cola (as opposed to Pepsi-Cola, which they received). 692 F.2d 1250, 1255 (9th Cir. 1982).
However, even assuming that this testimony is not admissible to show the mindset of the customer (but see Fed. R. Evid. 701(a) ), it is direct evidence of the mindset of the ETS employees.[3] To succeed on its claim, S'well had to prove that ETS employees intentionally sold Force Bottles to people who requested S'well Bottles. But ETS employees testified that they thought the customers who used the word "S'well" in fact wanted Force Bottles. If the jury believed these witnesses, then it would not find the requisite bad faith.
There is ample additional evidence that tends to support these employees' testimony. ETS's business is primarily selling drinkware that is very similar to popular brands, but is sold at a lower price. See, e.g., P-21A (ETS "Retail Brand Guide" listing dozens of retail brand water bottles and their ETS equivalent). There was evidence that many of ETS's customers were repeat players familiar with ETS's business model and the products it sells. See Tr. 338:16-25 (testimony of Sharon Eyal) ("All our distributors, you know, we work with them on an on-and-off basis throughout the years."). Indeed, almost all of the emails on which S'well relies appear to be from customers that had preexisting relationships with ETS. But see Tr. 530:16-19; P-55. Furthermore, Force Bottles ordered in bulk arrive to the customer in a large box that contains 24 bottles. That large box is labeled "H2Go Force." Within each large box are smaller boxes, also so labeled, containing six bottles each, and each individual bottle is in its own box, which is also so labeled. Tr. 545:24-5. A customer who wanted S'well Bottles but received Force Bottles would be immediately aware of the error. Under these circumstances, a reasonable jury could find that ETS salespeople would not, and did not, engage in a scheme to palm off Force Bottles for S'well Bottles, since it could so easily be detected.
By contrast, S'well cites minimal evidence of bad faith. ETS employees failed to correct their customers in the emails cited above, but that is perfectly innocent if the employees thought the customers were requesting Force Bottles. That ETS told its factory to make the Force more closely resemble the S'well Bottle, or compared the Force to the S'well in advertising and customer communications, means only that ETS believed (accurately, it would seem) that its customers wanted a product that was similar to the S'well Bottle, *439 not that ETS or its employees meant to trick anyone. S'well's motion for judgment as a matter of law on this ground is therefore denied.
B. Intentionally Suggesting That Force Bottles Are Affiliated With the S'well Brand
S'well also argued at trial that ETS intentionally marketed its Force Bottle as being formally affiliated with the S'well brand. S'well adduced no evidence at trial beyond what it submitted with its motion for summary judgment on this claim, so this motion is denied for the same reasons set forth in this Court's prior order on that motion. See ECF No. 77 at 38-40.
In brief, S'well relies on emails in which ETS employees arguably suggest that the Force Bottle is a version of the S'well Bottle. See P-80; P-172. However, the emails do not explicitly state that the two bottles are formally affiliated, and from their face it is at least equally likely that the emails were intended only to communicate that the two products are similar. Indeed, at trial the author of several such emails testified that he did not intend to misleadingly communicate any formal relationship between the bottles. See Tr. 565:7-18 (testimony of Robert Derrig) ("Q: So you are linking in this email your h2go Force with S'well, is that correct? A: Not with the actual brand S'well, but to give him an idea of that S'well style bottle that he may be looking for, that our h2go Force would be a comparable version that we carry.").[4]
A jury could reasonably credit this testimony. And they could easily believe that these emails were shorthand attempts to tell the customer that the S'well and Force Bottles are similar in shape and function, not to falsely suggest any formal relationship between them. S'well's motion for judgment as a matter of law on this ground is therefore denied.
II. Motion for a New Trial
Turning to S'well's motion under Rule 59(a), S'well contends that it is entitled to a new trial on its trade dress claims because (1) the Court erred by permitting defendants to admit bottles made by third parties that are shaped like the S'well Bottle, and this error prejudiced S'well; (2) ETS elicited testimony regarding foreign use of the S'well Bottle shape before S'well began marketing its bottles in the United States, despite the Court's order precluding testimony on that topic, and this testimony prejudiced S'well; and (3) because the verdict was against the weight of the evidence.
A. Admission of the Third Party Bottles
At trial, the Court admitted 113 bottles that shared a basic configuration with the S'well Bottle but were made by neither S'well nor ETS. Some of these bottles were purchased from Amazon by an employee of defense counsel, Tr. 693:15-694:24, and others by ETS's Vice President of Marketing, who purchased them from other manufacturers or distributors following a 2018 trade show, Tr. 468:24-469:6. S'well contends that these bottles should have been excluded under Federal Rule of Evidence 403 because, absent evidence of customer awareness of *440 these third party bottles, their prejudicial effect outweighs their probative value. They further argue that it was ETS's burden to show evidence of consumer awareness as part of its burden of demonstrating that the bottles were admissible.
Standing alone, as this Court held at summary judgment, the existence of these other bottles-no matter how many-cannot prove that S'well's trade dress has no secondary meaning. See ECF No. 77 at 8 ; see also Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.), 544 F.2d 1167, 1173 (2d Cir. 1976) ("Defendant introduced no evidence that these trademarks were actually used by third parties, that they were well promoted or that they were recognized by consumers."). Many of the cases that S'well cites similarly held that third party use alone does not render a mark generic. See Sunenblick v. Harrell, 895 F.Supp. 616, 627 (S.D.N.Y. 1995) ; Select Auto Imports Inc. v. Yates Select Auto Sales, LLC, 195 F.Supp.3d 818, 833 (E.D. Va. 2016) ; Gap, Inc. v. G.A.P. Adventures Inc., No. 07 CIV. 9614 AKH, 2011 WL 2946384, at *14 (S.D.N.Y. June 24, 2011).
However, failure to prove the defendant's whole case does not mean that the bottles are irrelevant and should be excluded. A large number of similarly-shaped bottles sold by a large number of other brands supports an inference that the relevant members of the public do not associate that shape with any single source. The specific circumstances under which the bottles were sold further supports that inference, and led in part to the Court's decision to admit the bottles after initially excluding them. ETS's witness testified that roughly 4,000 distributors came to the trade show to see the products offered by ETS and its competitors. Tr. 460:16-461:2. Those customers saw a clear division between the promotional section, where ETS and dozens of other similarly shaped bottles from other promotional brands were presented, and the brand section, where S'well was set up. Tr. 461:8-463:13. The other bottles came from Amazon, a very popular retail website. As the defense witness testified, when you are shopping on Amazon for a water bottle with a specific shape, Amazon automatically suggests other, similar bottles and displays their brand names. Tr. 698:10-699:6. A customer on Amazon and a distributor at the trade show would thus have additional reasons to associate the shape of the S'well Bottle with more than one brand.[5] Although this evidence would not suffice to find that S'well's trade dress has no secondary meaning, it is far from meaningless. As the saying goes, a brick is not a wall.
The problem, S'well contends, is that the jury would not appreciate the limited probative value of the bottles absent more robust evidence of consumer awareness. Overwhelmed with the physical presence of these bottles in evidence, the jury would incorrectly assume that consumer awareness was proportional to the distribution of bottles before them and that S'well's trade dress had no secondary meaning. According to S'well, the risk of this prejudice outweighs the bottles' limited probative value.
However, ETS disclosed to S'well the existence of 46 of these bottles well before trial, when S'well still had an opportunity to conduct its own discovery. During the *441 discovery period, ETS filed a motion for a preliminary injunction regarding some of its bottles that had been seized by the United States Customs and Border Protection office. ECF Nos. 33-36. In its letter brief, ETS argued that it was likely to succeed on the merits because the "strength of the registered mark is zero because it is generic-there are at least forty-six (46) different suppliers selling the same or nearly the same bottle and bottle cap configuration as the S'well bottle and bottle cap configuration." ETS No. 33 at 2. ETS cited a declaration from Lloyd Tajos, who also testified at trial, showing that he purchased 46 bottles from 46 different suppliers on Amazon, and included pictures of the bottles and the name of the suppliers. Id. This motion was filed at the beginning of September, 2017. Discovery did not close until November 10, 2017. Plaintiffs thus had every opportunity to discover the market share and advertising revenue of these other brands, and then to make specific arguments to the jury about the probative value of these bottles.[6] Having opted not to pursue this equally accessible and easily discoverable information, S'well cannot now complain that it is prejudiced without it.
Moreover, S'well cross-examined the relevant ETS witnesses regarding their knowledge of the market share of the bottles they bought, and established that they had no idea how many other were purchased or how many customers were aware of these brands. See Tr. 476:4-7; 707:10-13. S'well also emphasized at closing that the "bottle circus" was "like a magic trick to divert your attention away from what's really going on." Tr. 781:25-782:2. S'well counsel explained at length that the existence of the bottles "does not show that S'well is generic. It shows that others are coming into the market trying to capitalize." Tr. 790:25-792:1. The jury was thus placed on its guard against the very prejudice that S'well now argues devastated its case.
The bottles were relevant, particularly in conjunction with testimony about the circumstances of their acquisition. Any prejudice they caused was due to S'well's choice not to pursue readily available evidence. And, in any case, any supposed prejudice was largely erased by S'well's cross-examination and closing argument. S'well's motion for a new trial on this ground is therefore denied.
B. Testimony Regarding Foreign Use of the S'well Shape
S'well also contends that it was prejudiced by some few mentions of foreign use of the S'well shape that predated S'well's entry into the domestic market. According to S'well, this testimony misled the jury into believing that S'well had to prove that it invented or first used the relevant shape in order to succeed on its trade dress claim. Recognizing this risk, the Court granted S'well's motion in limine to exclude this evidence before trial. Tr. 5:1-2.
Despite this order, there was some testimony referencing the fact that similarly shaped bottles had been produced in China and India before S'well began making them. This limited testimony, as the Court explained in reference to ETS's mention of an Indian patent during its opening statement, *442 was relevant not to show who invented the shape, but to ETS's good faith, which was at issue since S'well sought willful damages. Tr. 412:25-413:6.
But even assuming that this testimony was elicited in violation of the Court's order, S'well has not demonstrated that it suffered any prejudice therefrom. There was very little testimony on this score, and was not even referenced in closing arguments. Moreover, the Court's Instructions of Law to the Jury clearly stated that, "[f]or S'well to have achieved secondary meaning with its trade dress, it is not necessary for S'well to have invented the bottle's shape or configuration. Rather, it is only necessary that the consuming public has come to identify that shape or configuration with S'well." ECF No. 128 at 16. Thus the jury was explicitly instructed that the question of who invented the bottle shape was irrelevant to the question of secondary meaning. S'well's motion for a new trial on this ground is therefore denied.
C. The Weight of the Evidence
S'well also contends that it is entitled to a new trial because the jury's verdict was against the weight of the evidence. "[A] decision is against the weight of the evidence, for purposes of a Rule 59 motion, if and only if the verdict is seriously erroneous or a miscarriage of justice." Farrior v. Waterford Bd. of Educ., 277 F.3d 633, 635 (2d Cir. 2002). Unlike a motion for a directed verdict, a district court deciding whether to grant a new trial on this basis "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 418 (2d Cir. 2012).
"[T]o succeed in a Lanham Act suit for trademark infringement, a plaintiff has two obstacles to overcome: the plaintiff must prove that its mark is entitled to protection and, even more important, that the defendant's use of its own mark will likely cause confusion with plaintiff's mark." Gruner + Jahr USA Pub v. Meredith Corp., 991 F.2d 1072, 1074 (2d Cir. 1993).
In the Court's view, the evidence at trial was strongly in favor of S'well on every issue in this case but one: whether the S'well Bottle's trade dress had acquired a secondary meaning before ETS began marketing the Force Bottle in the summer of 2014. See PaperCutter, Inc. v. Fay's Drug Co., 900 F.2d 558, 564 (2d Cir. 1990) ("To qualify for trademark protection, an owner of a descriptive mark must demonstrate that the mark had acquired secondary meaning before its competitor commenced use of the mark."). As the Court explained in its instructions to the jury, because S'well registered its trade dress with the Patent and Trademark Office in January 2017, ETS bore the burden of proving that it had no secondary meaning after that time. See ECF No. 128 at 17 ; 15 U.S.C. § 1057(b). However, S'well still had the burden of proving that its bottle had acquired secondary meaning before the Force Bottle entered the market in the summer of 2014.
Admittedly, S'well put forward ample evidence for the jury to find that it met its burden on this score, including significant unsolicited media coverage, corporate partnerships, advertisements, and sales. See, e.g., Tr.68:20-69:10; P-190; P-210. However, that evidence was not so overwhelming that the contrary verdict was a miscarriage of justice. The bulk of S'well's evidence of secondary meaning related to the *443 years after 2014. S'well had $ 50 million in sales in 2015 and $ 100 million in 2016, but only $ 1.9 million in 2013 and $ 10 million in 2014. Tr. 68:7-23. S'well's survey expert could not testify regarding the existence of secondary meaning in 2014. Tr. 304:14-15 ("I think that it would be difficult to project the results back to 2014. I don't have any data or basis for doing that."). And much of the advertising and media coverage that S'well submitted was after 2014. See P-190; P-210. ETS also put on evidence that there were several other manufacturers of similar bottles before 2014, see D-34, D-313, though they did not adduce evidence of customer awareness of those brands.
Thus, in the Court's view, the question of whether the shape of the S'well Bottle had achieved a secondary meaning by the summer of 2014 was a relatively close question. The Court is therefore unconvinced that the jury's verdict was seriously erroneous or a miscarriage of justice. S'well's motion for a new trial on this ground is therefore denied.
For the reasons given, S'well's motion for judgment as a matter of law and motion for a new trial are denied. The Clerk of Court is hereby ordered to close all open motions on this docket.
SO ORDERED.

The factual background of this case was recounted in greater detail in the Court's summary judgment opinion, familiarity with which is here presumed. See ECF No. 77.

Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, footnotes, and citations are here omitted.

Good faith was expressly not at issue in Overland, which dealt with trademark infringement under the Lanham Act and not unfair competition under New York common law. 692 F.2d at 1256 n.16.

S'well also points to the "Retail Brand Guide," P-21A, which some ETS employees distributed to customers. But this guide would not confuse a distributor into thinking that the Force Bottle was a version of the S'well Bottle, as the purpose of the Guide is clear: to compare the more expensive, separate, retail bottles with ETS's own products. The Guide contains dozens of other retail brands along with their ETS analogue, and no suggestion that ETS's products are affiliated with any of those brands.

This case is thus distinguishable from Lexington Management Corporation v. Lexington Capital Partners, in which the court held that a simple list of businesses using the word "Lexington" in their names was "not competent evidence" because there was not even evidence before the court of what the companies did, much less whether the marks were actually used by these businesses or recognized by consumers. 10 F.Supp.2d 271, 282 (S.D.N.Y. 1998).

Admittedly, S'well did not have the same opportunity for discovery regarding the other 67 bottles, many of which were acquired after a trade show that occurred after discovery ended, and which were the subject of a motion in limine filed shortly before trial. However, the admission of these additional bottles was cumulative, and did not meaningfully prejudice the defendant any more than the admission of the first 46 did, making their admission harmless.